# Illinois Official Reports

## Appellate Court

***People v. Sharp*, 2015 IL App (1st) 130438**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEYSHON SHARP, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-13-0438 |
| Filed | January 21, 2015 |
| Rehearing denied | February 26, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for attempted first degree murder based on a shooting that was suspected to be gang-related, defendant failed to meet his burden under the plain error doctrine of showing that the jurors were prejudiced when several of them were contacted by suspicious calls telling them to report for trial two hours later than the judge had instructed them to appear, the trial court did not deprive defendant of a fair trial when he instructed the jury with modified instructions for attempted first degree murder that he claimed "misstated the law and contained confusing sentence fragments" and his counsel's failure to object did not prejudice defendant. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-12357; the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on          Michael J. Pelletier and Jennifer Bontrager, both of State Appellate
Appeal              Defender's Office, of Chicago, for appellant.

                    Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg,
                    Tasha-Marie Kelly, and Gina DiVito, Assistant State's Attorneys, of
                    counsel), for the People.

Panel               JUSTICE HYMAN delivered the judgment of the court, with opinion.
                    Presiding Justice Pucinski and Justice Lavin concurred in the
                    judgment and opinion.

## OPINION

¶ 1    Defendant Keyshon Sharp was charged with multiple offenses in the shooting of Nicholas Coleman. The first of his two jury trials ended in a mistrial. The second jury found him guilty of attempted first degree murder and aggravated battery with a firearm. The court sentenced Sharp to a total of 55 years' imprisonment.

¶ 2    Sharp claims the trial court erred by not ordering a mistrial when it learned at least five of the jurors in his second trial had received telephone calls falsely informing them that the court time had been delayed two hours. Sharp argues the trial judge should have questioned the jurors more extensively than he did, particularly about their ability to be fair after the improper contact, and admonished the affected jurors not to speak to the remaining jurors about the calls. We decline Sharp's invitation to review this claim under the plain error doctrine, finding his argument has not met either prong of the doctrine.

¶ 3    Sharp next contends the trial court deprived him of his right to a fair trial before a properly instructed jury by accepting the State's non-Illinois Pattern Jury Instruction (IPI) for the offense of attempted first degree murder. The modified instruction accurately stated the law as it applied to Sharp and, therefore, the trial court did not abuse its discretion when it instructed the jury with the State's proffered non-IPI jury instruction. Defendant's alternate argument that his trial counsel was ineffective for failing to object to the jury instruction modification likewise fails.

¶ 4    Sharp further argues the trial court erred by allowing gang evidence into the trial. Sharp complains of three instances which he argues prejudiced the jurors against him: (1) *voir dire* questions about the possible use of gang evidence; (2) the use of defendant's nickname, "Baby Stone"; and (3) the State's introduction of a "wanted" poster, which included Sharp's nickname. The trial court properly asked the prospective jurors about their ability to consider possible gang evidence for the limited purpose it might be offered, *i.e.*, to ensure the jurors would not be prejudiced against Sharp should gang evidence come out at trial. Moreover, evidence of Sharp's nickname and the "wanted" poster do not imply gang affiliation. The

information was solicited by the State for the proper purpose of establishing how the eyewitnesses identified Sharp.

¶ 5 Next, Sharp argues his trial counsel was ineffective for failing to: (1) object to the *voir dire* questions concerning potential gang evidence; (2) object to the introduction of the "wanted" poster; (3) object to the State's proposed jury instructions; (4) present the two alibi witnesses that were called in the first trial; (5) make a threshold showing sufficient for the admission of evidence that another individual confessed to the crime; (6) move for a mistrial when the parties learned some jurors received phone calls falsely informing them of a delayed start time; and (7) object when only 10 of the 12 jurors were polled. Sharp's claims fail because he cannot show counsel's decisions were deficient and that he was prejudiced as a result. The record shows trial counsel presented a viable, consistent defense and acted as an advocate for Sharp.

¶ 6 Sharp argues he was denied assistance of counsel during the posttrial proceedings and at the sentencing hearing, claiming posttrial counsel failed to obtain transcripts from Sharp's trial, failed to participate in the posttrial proceedings, did not file or argue a posttrial motion on Sharp's behalf and presented no evidence or arguments in mitigation during Sharp's sentencing hearing. Defendant has failed to overcome the strong presumption that posttrial counsel's alleged inaction was part of his trial strategy. Moreover, even if defendant could, he has not shown how he was prejudiced by posttrial counsel's actions and, therefore, his claim fails.

¶ 7 Sharp also argues his 55-year sentence for attempted first degree murder is excessive in light of his "substantial rehabilitative potential" and strong family ties. The trial court did not abuse its discretion in sentencing Sharp. His sentence is within the statutory range and is proportionate to the nature of the offense. We further find no merit to Sharp's contention that the 30-year firearm enhancement that was applied to his sentence is void because it is unconstitutionally vague both on its face and as applied. We affirm his sentence.

¶ 8 Lastly, Sharp argues, and the State concedes, that the mittimus must be amended to reflect the correct offense name and class, and the proper statutory citation. We agree. Accordingly, we uphold the judgment of the trial court and correct the mittimus to reflect that Sharp was found guilty of attempted first degree murder, Class X (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)).

¶ 9 BACKGROUND
¶ 10 Procedural History
¶ 11 Sharp was charged with multiple counts of attempted first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm and aggravated battery in the shooting of Nicholas Coleman. Sharp demanded a jury trial. Before trial, the State nolled all the counts except for one count of attempted first degree murder and aggravated battery with a firearm.

¶ 12 In connection with *voir dire*, the State asked the court to question the prospective jurors about whether they knew any police officers or lawyers and whether they were acquainted with anyone in a street gang. The State contended the information would be important because Sharp listed Emani Fort, the granddaughter of El Rukn gang leader Jeff Fort, as a potential witness and defendant was identified as "Baby Stone" by two eyewitnesses, which

could show an allegiance to the Black P. Stones gang. The State asked for a proffer as to what Emani would testify to because she was not an occurrence witness and was not named as an alibi witness in Sharp's original filing of his affirmative defense.

¶ 13    Defense counsel did not object to the gang affiliation inquiry of the venire. As a proffer, counsel stated the purpose of Emani's testimony was to refute Nicholas's statement that he previously met or saw Sharp through her. Emani would testify that she never met Sharp and that Nicholas did not meet Sharp through her.

¶ 14    The court admonished the venire:

> "You may hear evidence of street gang membership by the Defendant. Although street gangs have a negative connotation, the purpose of this evidence would be limited and should not be considered as evidence of the defendant's propensity to commit crimes."

> "Do you have any personal knowledge of anyone in a street gang; and, if so, what gang?"

¶ 15    At the first trial, the defense theory was that Sharp did not commit the shooting because he was picking up his sister's children from daycare at the time. Three witnesses testified on Sharp's behalf–a daycare employee, Sharp's sister, and a friend Sharp was with before picking up the children. Sharp did not testify. At the close of its case, defense counsel requested a continuance, stating new evidence had come to light concerning the "real offender." Counsel claimed that Emani Fort and Mercedes Green would testify that Ronald Jackson told them he was responsible for the shooting. The judge denied defense counsel's request, finding the evidence lacked an indicia of reliability and further noting that he believed the timing of the new evidence was suspicious.

¶ 16    When jury deliberations proved unsuccessful, the jury hung and the court declared a mistrial. The court immediately set the case for retrial.

¶ 17    The State again, without objection, had the judge ask the two gang-related questions to the venire. The judge stated that all of his *in limine* rulings from the original trial would remain in effect, he denied defense counsel's request for a continuance to investigate the evidence of a third-party confession, and he ruled that defense counsel could not introduce the evidence of the confession through Emani Fort.

¶ 18    The parties selected 12 jurors and 2 alternates. One juror was excused the first day for her language abilities and an alternate was seated. The parties agreed to proceed with only one alternate.

¶ 19    At the conclusion of the evidence, the jurors were told to return to court at 9 a.m. the next day for closing arguments and deliberations.

¶ 20    Shortly after 9 a.m. the following morning, only 9 out of the 13 jurors were present. The deputy sheriff called the missing jurors, getting ahold of three of them, and learned that they had been called the night before and told to report two hours later. When the late jurors arrived, the trial judge brought them into chambers individually and asked, "Why were you late this morning?"

¶ 21    The first juror questioned, D.B., stated that a woman called his home and informed him the court time had changed to 11 a.m. D.B. received the call at the number he provided on his juror information card. The trial judge asked if anything else was said and the juror replied no. The first juror left and the second was brought in.

¶ 22    The second juror, N.V., was asked the same question. She responded that she had received a call at 4 p.m. the day before at the number she listed on her juror card. The woman caller told N.V. she was the trial judge's secretary and that the judge would like to change the arrival time to 11 a.m. N.V. asked the caller, "Let me get this straight. He's changed it to eleven?" and the caller said, "Yes." N.V. showed the trial judge the number that placed the call to her and stated that her caller I.D. displayed "Cook County Government Building" or something to that affect. She told the trial judge she was upset she was late and he told her not to be. The trial judge told her it was "no problem" she was late.

¶ 23    The third juror, D.P., was brought into chambers next. When asked why she was late, she responded that she received a call shortly after she returned home that came up as "Cook County Sherriff" or something similar and she was told to come in at 11 a.m. The trial court confirmed that was all that was said and that the number she received the call at was the one listed on her juror card.

¶ 24    The trial judge had a discussion with the parties and stated that it was clear that someone from a Cook County number called the jurors and that it should be looked into. The judge concluded that it was clear that "nothing else was said, other than to come in at 11:00 o'clock." When counsel suggested the calls had "to do with delaying this case," the court responded, "Okay. That is enough. I don't see anything improper so, therefore, we're going to continue." The judge recessed the proceedings until 11 a.m. to wait for the fourth delayed juror.

¶ 25    When another juror indicated to the sheriff that she had received a call, she was brought into chambers. The juror stated that she received two calls from "Cook County" between 4:30 and 5 p.m. the night before. She did not answer because she did not recognize the number. She called the number back and reached a recording indicating it was a Cook County number. The number she received the call on was the one listed on her juror card.

¶ 26    When the last of the missing jurors, A.R., arrived, he was brought into chambers. A.R. stated that he received a call that he should return to court at 11 a.m. A.R. did not get the call on his cell phone, which was the number listed on his juror card, but rather on his house phone. The trial judge excused A.R. from chambers and separated him from the other jurors. The court found it suspicious that this particular juror was the only one to receive the call at a number not listed on his juror card, so the court excused him.

¶ 27    Defense counsel objected to A.R. being excused. In response to defense counsel's suggestion that more information was needed before the juror could be excused, the court stated:

"Well, the problem is this. This is a retrial and the last time there was alleged–it just so happened that the only hold-out was a person that had concerns about gang members that belong to the same gang as the defendant milling around her car. So it was a hung jury.

I then took action to segregate the jurors, but apparently, somehow, *** this has not stopped and, somehow, I don't know what the heck is going on but whatever is going on, its raises a red flag, especially if he would have told me he got a phone call on the number that he put on the jury card, then it would have been similar to the rest of them.

- 5 -

He says that he put the cell number, a cell phone number on the jury card, but then got a call at home and that definitely, raises a red flag.

So I am going to dismiss that juror and I am going to impanel the other alternate."

The alternate juror was impaneled over defense counsel's objection.

¶ 28  The jury returned and heard closing arguments, was instructed and deliberated. At the conclusion of the second trial, the jury found Sharp guilty of attempted first degree murder and aggravated battery with a firearm.

¶ 29  After the finding of guilt, Sharp's privately retained trial counsel was given leave to withdraw and new counsel was granted leave to file an appearance. After a nine-month delay, the trial court denied Sharp's motion for a continuance, as well as his motion to reconsider. The court sentenced Sharp to 25 years for attempted first degree murder and 30 years for discharge of a firearm.

¶ 30                                         Factual History

¶ 31  Around 5 p.m. on June 21, 2011, Nicholas Coleman pulled his car into the driveway of the home he shared with his mother in Harvey, Illinois. Nicholas's father, Joseph Coleman, was a passenger in the car. Both Nicholas and Joseph saw Sharp standing by the fence near Nicholas's house. Nicholas knew Sharp and testified he had never had any problems with him, so when he saw Sharp by the fence, he believed he was "just walking by." Nicholas got out of the car and began walking toward the house. Joseph got out of the car, too, to remind Nicholas not to forget his cell phone. Joseph then got back in the car.

¶ 32  Nicholas had a dog that was on the other side of the fence. As Sharp walked toward Nicholas's house, he asked Nicholas about his dog. Sharp stood 10 feet away from Nicholas, face-to-face. Nicholas testified he was so close to Sharp, he could see him bite his lip and reach for his hip.

¶ 33  From the car, Joseph saw Sharp walk up to Nicholas and make a motion like he was going to "hug" him. Joseph saw Sharp pull out a gun. Nicholas testified he saw the gun in Sharp's hand and saw that it was pointed at him. Sharp fired the gun at Nicholas, but Nicholas was not hit. Nicholas ran and Sharp chased him. Joseph got out of the car and ran into the street for help.

¶ 34  As Nicholas ran, Sharp shot him in the back of the leg. Joseph saw Sharp shoot and watched as his son fell to the ground. After Nicholas fell, he immediately turned over onto his back and covered his head with his arms. Nicholas testified he did not cover his eyes and watched as Sharp ran toward him. Nicholas saw Sharp aim his gun and fire. Sharp stood over Nicholas with his arm extended toward him with the gun.

¶ 35  Joseph watched from the street as Sharp stood over Nicholas, aimed his gun and repeatedly fired into Nicholas's body. Nicholas testified he could see Sharp's face clearly.

¶ 36  When Sharp stopped firing, he jumped over the fence toward the alley behind Nicholas's house. Nicholas was conscious and tried to stand, but was unable to. A woman came to his aid and called 911.

¶ 37  Joseph saw Sharp come out of the alley and go over to Mauryce Brown's car. Mauryce had lived next door to Nicholas for two years and sold him the puppy. Brown testified he was around the corner and heard four or five gunshots. About 30 seconds after the last gunshot, Sharp approached his car and asked to "get in." Brown saw Sharp was holding a gun. He did

- 6 -

not let him in. Sharp ran; Brown did not see where. Brown drove down the street a few feet, until he saw Nicholas lying on the ground. He then he got out to help.

¶ 38    Detective Jason Banks arrived at the scene within 10 minutes of the shooting and spoke with Brown, who identified the shooter as "Baby Stone" and believed his name was "Keyshon." Brown told Detective Banks he had seen Sharp with a gun right after the shots were fired.

¶ 39    The day after the shooting, Detective Banks put together a photographic array, which included a photo of Sharp. Brown identified Sharp as the individual he had seen the day before with a gun. Detective Banks created a "wanted" poster with Sharp's first and last name, description, nickname and photo. Joseph also viewed the photo array containing Sharp, but did not identify anyone.

¶ 40    On July 7, Detective Banks was able to speak with Nicholas at the hospital and ask who shot him. Nicholas responded, "Baby Stone." Detective Banks showed Nicholas a photo array and Nicholas identified Sharp as the person who shot him.

¶ 41    Nicholas was shot seven times in his calf, thigh, groin, chest, elbow, neck and under his arm. He underwent surgery to put in a tracheotomy tube so he could breathe, as well as to repair the damage done to a main artery by one of the bullets. Nicholas could not speak or eat for two weeks and remained hospitalized for three weeks. When he was released, Nicholas still had trouble breathing and could not speak in full sentences without stopping to take a breath. His vocal cords are permanently damaged and he has severe nerve damage in his left arm.

¶ 42    On July 13, Sharp turned himself into the police. He told the police he was picking up his sister's children at Great Expectations Day Care the day of the shooting. That same day, Detective Banks asked Brown, Nicholas and Joseph to view a physical lineup at the police station. The three men viewed the lineup separately. Brown identified Sharp as the individual he saw with a gun on the day of the shooting and Nicholas and Joseph both identified Sharp as the shooter.

¶ 43    At the conclusion of the State's case-in-chief, the court denied Sharp's motion for a directed finding. The defense presented the same alibi it did during Sharp's first trial–that he was picking up his sister's children from daycare at the time of the shooting–but, at the second trial, the defense only presented one witness, Kenneth Woods, the director of Great Expectations. Woods testified the daycare kept sign-in sheets for each child and required parents to sign the children in and out each day. On June 21, Sharp's name was on the sign-out sheet for his sister's children, with the time listed as 5:30 p.m. Woods testified he had no personal knowledge of anyone who signed in or out on any particular day and that the sheets were kept in a book on a table and remained out for a month before being filed in his office. He testified that other sign-out sheets for Sharp's sister's children did not have anyone listed for sign-out, so the sheets were left blank. Woods acknowledged that the sign-out sheet sits out in the open and is vulnerable to being filled out at a later date. Also, sometimes children are picked up without anyone signing the sign-out sheet. Woods further acknowledged that Sharp did not have authorization to pick up his sister's children. The sign-out sheet was admitted into evidence and the defense rested.

¶ 44    The State called Detective Banks in rebuttal. He testified it would take four minutes to drive from Nicholas's house to Great Expectations. The State rested. The jurors were released for the day and told to return at 9 a.m. the following morning.

¶ 45    As discussed, some of the jurors returned late after receiving a phone call improperly informing them the court time had been delayed until 11 a.m. One of the jurors was dismissed and the alternate impaneled.

¶ 46    The parties presented closing arguments and the jury was instructed with the State's proposed instruction for attempted first degree murder rather than the Illinois pattern instruction.

> "A person commits the offense of attempt first degree murder when he, with the intent to kill an individual, does any act which constitutes a substantial step towards the killing of an individual.
>
> That during the commission of the offense of attempt first degree murder, the defendant personally discharged a firearm that proximately caused great bodily harm to another.
>
> The killing attempted need not have been accomplished."

The court instructed the jury that to sustain a conviction of attempted first degree murder, the State had to prove all three propositions and that, "If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty."

¶ 47    When the jury returned a guilty verdict of attempted first degree murder and aggravated battery with a firearm, it was polled, with only 10 jurors being questioned. Defense counsel filed posttrial motions; however, because Sharp sought a new attorney, trial counsel asked for leave to withdraw, which the court granted.

¶ 48    On March 6, 2012, Sharp's new counsel, Michael Oppenheimer, was granted leave to file an appearance. Defendant's presentence investigative report was tendered to counsel; counsel acknowledged receipt on the record. The case was continued.

¶ 49    The following court date, April 27, Oppenheimer informed the court trial transcripts had been ordered to "fully brief the motion for new trial," but had not yet been received. The court cautioned, "I'm not going to wait forever, counsel." Counsel indicated he understood. The court continued the matter to June 10, with defendant's brief due June 8 and the hearing scheduled for June 21.

¶ 50    On June 22, Oppenheimer filed a petition for the court to provide a free transcript claiming Sharp was indigent and he was representing him *pro bono*. Counsel acknowledged he had a partial transcript from Sharp's trial attorney. The State responded, arguing counsel's request should be denied because even though he appeared on Sharp's behalf on March 6, April 16, and April 27, he never represented to the court that Sharp was indigent or that he was representing him *pro bono*. The trial court denied Oppenheimer's request for free transcripts. The court informed defense counsel it would proceed on posttrial motions at the next court date regardless of whether counsel had the transcripts.

> "Next court date, we're proceeding on the motion. I don't care whether you have the transcripts or not, we're going ahead. I will give you enough time. If you want to get your transcripts you could get them. I will give you an August date but that's it. We're going to a hearing on posttrial motions."

The court continued the matter to August.

¶ 51    On August 24, defense counsel stated he was unable to supplement the formerly filed posttrial motion for a new trial because he did not have transcripts. Oppenheimer argued

Sharp's "due process rights were violated" by the court's denial of his request for a free transcript. Counsel indicated that without the transcripts, he could not proceed. The court denied counsel's request for a continuance and proceeded to the hearing.

¶ 52 Oppenheimer argued:

> "Judge, there is nothing to proceed on with regard to the hearing. I don't have the benefit of the transcript in order to argue anything but a bare bones motion for a new trial. Just so the record is clear because you have denied his right to a free transcript."

The court denied counsel's motion for a new trial. Counsel requested 30 days to file a motion to reconsider; the court denied the request. The judge told counsel to file a motion to reconsider if he wished and proceeded to sentencing over defense counsel's objection.

¶ 53 Counsel indicated he was "not prepared" for sentencing and suggested it was because all that had been set was posttrial motions, which the court ruled on "without the benefit of counsel's argument" or the transcript. In response, the court stated:

> "Okay. Well, let me explain something. The reason there has been no argument [is] because you chose not to do any argument on this matter. *** [Y]ou come in here, and you represented to this Court back in February that you would have everything read and ready to go in April. It's continued from April to June. In June, you came in on a motion to have a free transcript. It is the policy of this Court that transcripts are not given to private Counsel. If you are going to represent somebody pro bono, you will then represent him pro bono to the full extent that is required to properly represent him. You don't pick and choose to represent him pro bono, and then ask for free transcripts. That is not the case because every lawyer would then come in on that basis to ask for free transcripts by this Court. That is not going to happen. You decided to represent him pro bono, therefore, it is incumbent upon you to obtain whatever documents are necessary for you to proceed. You have chosen not to get those documents. It's not the Court's fault. I have given you six months from the date that you filed your appearance to get those transcripts, and you have done–have not done so. So it's not the Court's fault. It's your fault for not proceeding on it. So, we're ready to go."

Posttrial counsel renewed his request for a continuance to prepare for sentencing and to file a motion to reconsider the court's denial of defendant's motion for a new trial. The court indicated it would pass the case for 30 minutes to allow defense counsel to prepare and file a motion to reconsider. Counsel indicated he would not prepare his motion during that time and argued it was "absolutely ridiculous" for the court to grant the State's request requiring him to do so. The State argued it was "absolutely ridiculous" for defense counsel "to ask for a motion to reconsider on a motion that [he] refuse[d] to argue." The court denied posttrial counsel the opportunity to file a motion to reconsider and continued to sentencing. Again, posttrial counsel indicated he was not prepared for sentencing.

¶ 54                                    Sentencing

¶ 55 The court indicated it had defendant's presentence investigative report (PSI) and asked the parties if there were any corrections, deletions or modifications that needed to be made. The State asked that the PSI be corrected to reflect two convictions for armed robbery rather than simply robbery. Posttrial counsel indicated he was not prepared for sentencing and

informed the court that he had not read the PSI. Again, he requested a continuance. The State informed the court the PSI was prepared and distributed after Oppenheimer was granted leave to appear on defendant's behalf. The court denied posttrial counsel's request for a continuance and the State presented evidence in aggravation.

¶ 56    The State called Christopher Lundy of the Riverdale police department, who testified that on July 13, 2006, he investigated an armed robbery. Lundy, along with other officers, pursued the robbers in a high-speed chase; Sharp was the driver. Sharp was later identified by the victims of the armed robbery. Defense counsel objected to the introduction of this evidence and informed the court: "I am definitely not prepared to deal with this witness." The court informed counsel the armed robbery evidence was part of defendant's PSI and overruled counsel's objection. Posttrial counsel did not conduct cross-examination of the witness.

¶ 57    The State presented Detective Banks, who testified he investigated the attempted murder of Rodney Bowles and that Bowles told him that "Baby" had caused his injuries. Posttrial counsel objected a few times throughout Banks' testimony and conducted cross-examination. During cross, Banks acknowledged the Bowles' case file was never tendered to either party and he did not seek to have Sharp charged in the case.

¶ 58    The State also called Franky White, who testified that on June 9, 2011, he was shot in the thigh by Sharp as he sat on the porch with his girlfriend. Oppenheimer objected a few times throughout and renewed his request for a continuance before cross-examining and re-cross-examining White.

¶ 59    Following presentation of its live testimony, the State presented Nicholas's victim impact statement. At the conclusion of the State's presentation in aggravation, defense counsel renewed his request for a continuance, which the court denied.

¶ 60    Defense counsel presented no mitigation evidence and no argument.

¶ 61    The trial court discussed both mitigation and aggravation in detail before sentencing Sharp to 25 years for attempted first degree murder and 30 years as an enhancement for the discharge of the firearm during the commission of the crime. The court stated it had reviewed Sharp's presentence investigative report and acknowledged Sharp's prior criminal background. The court found it troubling that Sharp told a probation officer he quit the Black P. Stone Nation street gang in 2009, but then told the officer when he was arrested that he is a member of the gang. The court acknowledged defendant's family, specifically that he is a father.

¶ 62                                    ANALYSIS
¶ 63                                   Jury Contact
¶ 64    Sharp contends the trial court should have ordered a mistrial when it learned certain jurors had been improperly contacted and told they were to report two hours later than the judge had instructed them. Sharp argues the trial judge failed to properly question the jurors who received the suspicious phone calls and that the court's error deprived him of his right to a fair trial before an impartial jury. Sharp contends the trial judge should have specifically asked each affected juror if he or she could be fair in light of the external contact. Sharp further argues the phone calls caused an appearance of impropriety and asks this court to presume prejudice.

¶ 65    The State maintains Sharp waived this issue and further contends the trial court properly handled the incident without further inquiry when it found no harm was caused by the phone calls. We agree. Sharp failed to object at trial or raise this issue in a posttrial motion, forfeiting review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Recognizing this, Sharp urges the plain error doctrine under which we may review a forfeited error when either (1) "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or (2) "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). The defendant bears the burden of persuasion under both prongs. *Id.* at 187. If the defendant fails to meet this burden, "we must honor the procedural default" created by his or her failure to properly preserve the claim for review. *People v. McCoy*, 405 Ill. App. 3d 269, 273 (2010).

¶ 66    The plain error exception to the waiver rule does not save Sharp's claim of error. The evidence was not closely balanced in this case. Two eyewitnesses, one of whom was the victim, viewed defendant in broad daylight, and from close proximity, fire his gun into Nicholas's body. A third witness heard the gunshots and then was approached immediately after by defendant, who asked to enter his car. All three witnesses identified defendant as the shooter. The error is not reversible under the first prong of the doctrine.

¶ 67    Under the second prong of the doctrine, this kind of error is only reversible when a defendant can demonstrate that the error resulted in the impaneling of a biased jury. "Trial before a biased tribunal would deprive defendant of a substantial right and constitute structural error requiring reversal." *People v. Runge*, 234 Ill. 2d 68, 102 (2009) (citing *People v. Rivera*, 227 Ill. 2d 1, 20 (2007), *aff'd*, 556 U.S. 148 (2009)). Due process requires " 'a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.' " *Runge*, 234 Ill. 2d at 103 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). In reviewing a judicial investigation of alleged juror misconduct, courts have recognized that " 'sometimes less is more' " and "that a trial court, in exercising its investigatory discretion, must assess the particular circumstances before it to ascertain whether questioning individual jurors might compound the problem by drawing attention to it." *Runge*, 234 Ill. 2d at 104 (quoting *United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004)). Whether jurors have been influenced and prejudiced to the extent they cannot be fair and impartial involves a determination that rests within the trial court's sound discretion and, hence, will not be disturbed on review absent an abuse of that discretion. *Runge*, 234 Ill. 2d at 104.

¶ 68    Sharp has not offered any evidence the jury was biased and, therefore, he has failed to meet his burden under the second prong of the plain error doctrine. We agree with the State that "there is no reason to presume prejudice based on the limited nature of the phone calls."

¶ 69    The trial judge properly questioned each juror about why he or she was late to court. The trial judge limited the questioning to the content of the phone calls, specifically, what was said, what time the call was received, and at what number the call was placed. Based on each juror's response, the judge determined the calls were limited to the time the jurors were to return to court the following day. Nothing linked either party to the making of the improper phone calls nor did the judge say anything to the jurors that could have implied the calls came from either side. None of the affected jurors stated anything to the judge that indicated

that he or she could not be impartial. The court clarified to the parties that it did not have a secretary and that the improper calls should be looked into. Neither party objected to the court's questioning of the jurors (defense counsel objected only when one of the jurors was excused because his circumstances varied from the others–he received the call at a number not listed on his juror information card–and no objection was made to continuing the trial with the other affected jurors still impaneled). The court properly exercised its discretion to determine that further questioning or admonishments were unnecessary.

¶ 70   Having failed to meet his burden of persuasion under either prong of the plain error doctrine, Sharp's forfeiture is not excused. We will not review Sharp's contention on its merits.

¶ 71                                     Modified Jury Instructions

¶ 72   Next, Sharp argues he was deprived of a fair trial when the court instructed the jury with modified instructions for attempted first degree murder that he claims "misstated the law and contained confusing sentence fragments."

¶ 73   Sharp acknowledges he did not preserve this claimed error either and again asks that we review it under the plain error doctrine. Sharp argues the "flawed instruction" was a substantial defect that rendered his trial fundamentally unfair.

¶ 74   A defendant forfeits his or her right to review of a jury instruction error if he or she fails to object to the instruction at trial and does not include the issue in a posttrial motion. *People v. Sargent*, 239 Ill. 2d 166, 188-89 (2010). Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), however, states that substantial defects in criminal jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." This rule sets the same limits as the plain error doctrine. *Sargent*, 239 Ill. 2d at 189.

¶ 75   The plain error doctrine allows a reviewing court to consider the unpreserved error if the defendant is able to meet his burden of persuasion under either prong, regarding whether the evidence was closely balanced or the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 178-79. For there to be plain error, there must first be error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 76   Sharp relies heavily on the fact that the firearm enhancement is not an element of attempted first degree murder, but a separate and distinct enhancement that must be presented to the jury and proven beyond a reasonable doubt. 720 ILCS 5/8-4(a), 9-1(a) (West 2010); 725 ILCS 5/111-3(c-5) (West 2010). Sharp contends that by inserting a sentence fragment from the firearm enhancement definition instruction into the attempted first degree murder definition instruction, the instruction provided to the jury did not properly state the law and was confusing.

¶ 77   The State replies that accepting its proposed non-IPI instruction was within the trial court's discretion and proper because the modified instruction accurately stated the law as it applied to Sharp. The State further maintains that defendant is unable to show prejudice. We agree.

¶ 78   "[A] jury instruction error rises to the level of plain error only when it creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." (Internal quotation marks

omitted.) *People v. Herron*, 215 Ill. 2d 167, 193 (2005). This standard is "difficult" to meet. *People v. Sargent*, 239 Ill. 2d 166, 191 (2010).

¶ 79    The court instructed the jury with a modified version of Illinois Pattern Jury Instructions, Criminal, No. 6.05X (4th ed. 2000) (portions added to the IPI instruction underlined):

> "A person commits the offense of attempt first degree murder when he, with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual. <u>That during the commission of the offense of Attempt First Degree Murder, the defendant personally discharged a firearm that proximately caused great bodily harm to another. The killing attempted need not have been accomplished</u>."

The jury was also given a modified version of Illinois Pattern Jury Instructions, Criminal, No. 6.07X (4th ed. 2000), with the personal discharge of a weapon language added (underlined below):

> "To sustain the charge of attempt first degree murder, the State must prove the following propositions: *First Proposition*: That the defendant performed an act which constituted a substantial step toward the killing of an individual; and *Second Proposition*: That the defendant did so with the intent to kill an individual. *Third Proposition*: <u>That during the commission of the offense of Attempt First Degree Murder, the defendant personally discharged a firearm that proximately caused great bodily harm to another person</u>. If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 80    We find no error regarding the jury instructions. Viewing the instructions as a whole, the instructions fairly, fully, and comprehensively informed the jury of the proper legal principles. Based on the evidence presented, the jury found Sharp guilty of attempted first degree murder and found he personally discharged a firearm in the commission of the offense. Having found no error, we decline defendant's invitation to review this issue under the plain error doctrine.

¶ 81    Sharp's alternate argument that his trial counsel was ineffective for failing to object to the jury instruction modification likewise fails.

¶ 82    To establish ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient, falling below an objective standard of reasonableness, and that he was prejudiced, meaning there is a reasonable probability that absent counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to satisfy either prong is fatal to the claim. *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 83    Having found the instruction proper, defense counsel's failure to object to the instruction did not prejudice defendant.

¶ 84                              Potential Gang Evidence

¶ 85    Sharp argues he is entitled to a new trial because the State was allowed to "repeatedly" inject evidence of his alleged gang membership into the trial despite the fact that the State

never presented a motive for the shooting or any other basis on which gang evidence could be properly admitted. Sharp argues the jury should not have been informed of his alleged status as a gang member and because it was, he was prejudiced. Sharp complains of three specific instances: (1) the court's instruction during jury selection that although the jurors may "hear evidence of street gang membership by the defendant," the "purpose of this evidence will be limited" and "should not be considered as evidence" of the defendant's propensity to commit a crime, as well as the court's questioning about whether any of the potential jurors had "personal knowledge of anyone who is or was involved in a street gang," and if so, what gang; (2) that the State elicited Sharp's nickname, "Baby Stone"; and (3) that the State introduced a "wanted" poster created by the Harvey police that contained Sharp's nickname.

¶ 86     Sharp acknowledges he did not properly preserve this error for review and asks that we review it under the plain error doctrine.

¶ 87     The State responds that plain error review is not necessary because no error occurred. The State maintains that the *voir dire* questions to the prospective jurors cannot be characterized as gang evidence. The State further contends the evidence of Sharp's nickname, including the "wanted" poster, was properly presented as identification testimony and as a narrative of his arrest.

¶ 88     Sharp argues that because the State elicited multiple identifications of him from its witnesses, his nickname was unnecessary and prejudicial. Sharp argues the State is incorrect that his nickname, "Baby Stone," was not linked to his gang membership. During *voir dire*, the potential jurors were asked whether they were familiar with the "Black P Stone Nation" street gang. Sharp argues evidence of his nickname was prejudicial because his nickname contains part of the gang's name within it. Sharp argues that because the potential jurors were "primed to look for Sharp's gang membership during *voir dire*," it was logical for them to make the connection that Sharp's nickname meant he was affiliated with a gang. Sharp contends the court improperly allowed the State to introduce this evidence without a limiting instruction.

¶ 89     We review a claim that the trial court's actions prevented the selection of an impartial jury under an abuse of discretion standard. *People v. Strain*, 194 Ill. 2d 467, 476 (2000). The primary responsibility for initiating and conducting *voir dire* lies with the trial court; the manner and scope of that examination falls within the court's sound discretion. *People v. Wilson*, 303 Ill. App. 3d 1035, 1041-42 (1999). The "purpose of *voir dire* is to assure the selection of an impartial panel of jurors free from either bias or prejudice." *People v. Williams*, 164 Ill. 2d 1, 16 (1994). Courts recognize there is a strong prejudice against gangs and gang members. "Conducting *voir dire* in gang cases presents particular challenges since gang membership is an area of potential bias." *People v. Strain*, 306 Ill. App. 3d 328, 335 (1999), *aff'd*, 194 Ill. 2d 467 (2000).

¶ 90     The trial court asked the prospective jurors about their ability to consider gang evidence for a limited purpose should it be admitted. The court cautioned that any such evidence could not be considered evidence of defendant's propensity to commit a crime and asked the jurors if they agreed. Defense counsel did not object to the State's proposed questioning of the potential jurors. Each impaneled juror stated that he or she would be able to consider any gang evidence for the limited purpose it was being presented and not as evidence of Sharp's propensity to commit crime. This line of questioning ensured a fair and impartial jury. The

court's questioning appropriately screened the potential jurors for bias and prejudice and allowed the parties to intelligently exercise their challenges.

¶ 91    We find no error in how the court conducted *voir dire*. In doing so, we find our decision in *People v. Thompson*, 2013 IL App (1st) 113105, instructive. In *Thompson*, although gang evidence was not expected to be an "integral" part of the trial, the possibility of its admission was left open. *Id*. ¶ 110. We held we could not "fault the trial court for being cautious in conducting *voir dire* and addressing the possibility in its questioning of the venire." *Id*. Consistent with what happened in this case, the court's *voir dire* questions in *Thompson* were the only reference to gangs throughout trial. *Id*. Just as we did in *Thompson*, we find it significant that in response to the trial court's admonishments, the prospective jurors all affirmatively indicated that they would follow the law and not use gang evidence as proof of guilt. *Id*.

¶ 92    Regarding the use of Sharp's nickname, the State maintains that the evidence was admitted for the limited purpose of showing the eyewitnesses' ability to identify Sharp as the shooter. The State argues that even if the evidence was erroneously admitted, Sharp cannot show he was unfairly prejudiced because the gang evidence was limited.

¶ 93    We review this issue under an abuse of discretion standard. *People v. Lucas*, 151 Ill. 2d 461, 489 (1992). Whether evidence is relevant and admissible is a decision we will not reverse absent an abuse of discretion which results in manifest prejudice to the defendant. *Id*. Evidence is properly admitted if it is relevant and its probative value is not substantially outweighed by its prejudice. *People v. Eyler*, 133 Ill. 2d 173, 218 (1989). Evidence is relevant if it has "any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Gonzalez*, 142 Ill. 2d 481, 487-88 (1991).

¶ 94    Our supreme court has held that because there is a "strong prejudice against street gangs," evidence that a defendant is a member of a street gang "is admissible only where there is sufficient proof that membership or activity in the gang is related to the crime charged." *People v. Strain*, 194 Ill. 2d 467, 477 (2000).

¶ 95    Sharp's contention that the use of his nickname was improper also fails. The trial court did not abuse its discretion in holding the evidence was relevant and its probative value was not substantially outweighed by the prejudice that could result from its admittance. We agree with the parties that the reliability of the identification of Sharp as the shooter by the victim and other eyewitnesses was critical. As Sharp puts it, the "sole issue at trial was the credibility of the witnesses' identification of [defendant] as the shooter, balanced against [defendant's] alibi." Because Sharp was not immediately apprehended after the shooting, the police investigation and Sharp's eventual arrest become relevant facts necessary for the trier of fact to hear. Both Nicholas and Brown identified Sharp to the police as "Baby Stone." None of the witnesses testified to the meaning of Sharp's nickname or linked it to any gang or gang membership. From Brown's description to the police of the shooter as "Baby Stone" and his statement that he believed the shooter's name was "Keyshon," the police were able to create a photographic array, which included Sharp's photo, for the witnesses to view. We disagree with Sharp's contention that the use of his nickname injected irrelevant and prejudicial gang evidence into his trial.

¶ 96    Sharp's contention that the "wanted" poster did the same also fails. The "wanted" poster offered at trial redacted any mention of Sharp's gang affiliation. It was discussed during

- 15 -

Detective Banks' testimony regarding how he investigated the shooting and eventually apprehended Sharp after he was identified by Brown as the shooter. Detective Banks testified the "wanted" poster contained defendant's first and last name, height, weight, general descriptors, last known address, nickname, "Baby Stone," and photograph. The poster was distributed to members of the Harvey police. Defense counsel, not the State, asked that the "wanted" poster with redactions go back with the jurors during deliberations.

¶ 97   The State never sought to have gang related evidence admitted. Without further explanation, Sharp's nickname is simply a nickname. The jury was never offered any evidence from which it could reasonably infer that Sharp's nickname meant he was a member of a street gang. The evidence of Sharp's nickname was relevant to the jury's consideration of the police investigation and to Sharp's ultimate arrest as the shooter. We find no abuse of discretion in the trial court's decision to admit this evidence for the limited purpose of showing the circumstances surrounding Nicholas's and Brown's identification of Sharp as the shooter.

¶ 98                    Ineffective Assistance of Trial Counsel

¶ 99   Sharp contends his trial counsel was ineffective for failing to: (1) object to the *voir dire* questions that were posed to the potential jurors about whether they knew anyone in a street gang, as well as the trial court's admonishment that if gang evidence was introduced, it should only be considered for a limited purpose; (2) object to the "wanted" poster being introduced at trial; (3) object to the modified jury instructions; (4) call two alibi witnesses from the first trial; (5) make a threshold showing sufficient for the admission of evidence that another individual confessed to the crime; (6) move for a mistrial when the parties learned that certain jury members were improperly contacted by phone and falsely told the court time had been delayed; and (7) object when only 10 of the 12 jurors were polled.

¶ 100   Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland*, 466 U.S. 668. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Under *Strickland*, a defendant must show not only that counsel's performance was deficient, but also prejudice because of it. *Strickland*, 466 U.S. at 687. To show deficient representation, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). To establish prejudice, the defendant must show there is a reasonable probability that but for counsel's deficient representation, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If an ineffective assistance of counsel claim may be disposed of on the ground of lack of sufficient prejudice, the court need not consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697.

¶ 101   The right to effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). *Strickland* requires only that a defendant receive a fair trial–a trial free of errors so egregious that they, in all probability, caused the conviction. *People v. Griffin*, 178 Ill. 2d 65, 91 (1997).

¶ 102   In determining whether counsel's performance was deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*,

466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Matters of trial strategy generally will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing. *People v. Henderson*, 2012 IL App (1st) 101494, ¶ 8; *People v. Guest*, 166 Ill. 2d 381, 394 (1995).

¶ 103    Sharp has failed to meet his burden to establish his first three claims of ineffective assistance of counsel for counsel's failure to: (1) object to the *voir dire* questions that were posed to the potential jurors about whether they knew anyone in a street gang, as well as the trial court's admonishment that if gang evidence was introduced, it should only be considered for a limited purpose; (2) object to the "wanted" poster being introduced at trial; and (3) object to the modified jury instructions.

¶ 104    Trial counsel did conduct meaningful adversarial testing of the State's case. Counsel pursued a theory of innocence, requiring the State to prove its case beyond a reasonable doubt. Although counsel's theory proved unsuccessful in the face of overwhelming evidence, specifically three eyewitnesses to the shooting, one being the victim, counsel's strategy was not unreasonable or deficient. Moreover, we already have determined the trial court's venire questioning and its admittance of the "wanted" poster were not in error and, therefore, defendant is unable to sustain a claim for ineffective assistance based on either action.

¶ 105    Regarding defendant's third claim–counsel's failure to object to the modified jury instructions–defendant must show there is a reasonable probability that the verdict would have been not guilty, but for counsel's alleged error, to show prejudice. Sharp is unable to meet his burden where the instructions, as discussed above, fairly and comprehensively advised the jury of the relevant legal principles and the evidence was overwhelming. Two eyewitnesses, one being the victim, viewed Sharp in close proximity, and in broad daylight, fire his gun into Nicholas's body. A third witness heard the shooting and identified Sharp as the individual who approached him immediately after and asked to get in his car. Defendant's claim of ineffective assistance of counsel based on the modified jury instructions fails.

¶ 106    We reject defendant's fourth and fifth claims: that counsel's failure to (4) call two alibi witnesses from the first trial, and (5) make a threshold showing sufficient for the admission of evidence that another individual confessed to the crime were the result of deficient representation. Counsel's decision about whether or not to present a particular witness is one of trial strategy and, accordingly, will generally not support an ineffective assistance of counsel claim. *People v. Flores*, 128 Ill. 2d 66, 85-86 (1989).

¶ 107    The record shows trial counsel conducted a thorough investigation of the potential defense witnesses and made a reasoned decision not to call two of the alibi witnesses from defendant's first trial, Curtis Anderson and Katrina Sharp. Counsel's decision to only call the daycare employee as an alibi witness was not the result of inadequate preparation, but trial strategy. The other two witnesses did not do well during cross-examination in defendant's first trial. The cross-examination of Curtis brought out that he was a member of the Black P. Stones gang, a three-time convicted drug-dealing felon, and that he never told the police or the prosecutor that he was with Sharp on the day of the shooting, even though he learned a week after that that Sharp was in custody for the crime. Curtis's testimony was that after drinking two or three beers and smoking marijuana, he drove defendant on a suspended license seven blocks to the daycare, so defendant could pick up his sister's children. Katrina Sharp's cross-examination was also not particularly helpful. Katrina testified that she learned

the police were looking for her brother on June 22, but did not tell him as much when she spoke with him two days later. Trial counsel presented defendant's alibi with testimony from the most credible individual out of the three potential witnesses, the daycare employee, Kenneth Woods. Doing so was a matter of reasonable trial strategy. Defense counsel reasonably decided not to present the weaker cumulative evidence from Curtis and Katrina and, instead, to focus the jury on defendant's alibi defense through Woods. Defense counsel's actions were reasonable and, therefore, cannot support defendant's claim of ineffective assistance.

¶ 108    As to (5), a threshold showing sufficient for the admission of evidence that another individual confessed to the crime, the State contends counsel could not make a showing of reliability of the evidence because the evidence he sought to admit was unreliable. After the State rested and defendant had put on his three alibi witnesses in the first trial, defense counsel was approached by Emani Fort and Mercedes Green. The women informed defense counsel they were part of a phone conversation with Ronald Jackson, in which he admitted to them that he shot Nicholas. Defense counsel informed the court this was new information, making clear he had spoken with Emani four or five days before and she had not mentioned the information. The trial court found the statements did not have "objective indicia of trustworthiness" and held they could not be admitted. At defendant's second trial, counsel again tried to have the testimony admitted, but the court denied his motion, finding the information still lacked any indicia of reliability.

¶ 109    Defendant fails to say what counsel's threshold showing should have been. He includes no information on appeal about the reliability of the third-party confession or what Fort's or Green's proposed testimony about the alleged confession would contain. It is arguable that the failure of counsel to make an offer of proof is deficient performance; however, the record does not support Sharp's claims that he was prejudiced by the alleged deficient performance of his attorney because the alleged testimony is not preserved in the record. Without this evidence, we cannot determine whether the trial court would have allowed defense counsel to have the potentially exonerating evidence admitted. When the record before us on appeal does not allow for such a determination, this court has consistently found a defendant's claims of ineffective assistance more appropriately a matter for determination in the context of a postconviction petition where a complete record can be made. See *People v. Holloman*, 304 Ill. App. 3d 177, 186-87 (1999); *People v. Kunze*, 193 Ill. App. 3d 708, 725-26 (1990).

¶ 110    Concerning defendant's claim that counsel was ineffective for (6), failing to move for a mistrial when the parties learned that certain jury members were improperly contacted by phone and falsely told the court time had been delayed, we find defendant unable to show prejudice to satisfy his burden under *Strickland*. See *Henderson*, 2012 IL App (1st) 101494, ¶ 8. (Defendant must show a "reasonable probability that the motion would have been granted."). The phone calls were limited in nature and no party was attached to them. The trial court properly determined that none of the jurors were prejudiced against defendant because of the improper contact. Thus, had defense counsel made a motion for a mistrial at this point, it would not have been successful and, therefore, counsel's inaction cannot be shown to be ineffective assistance of counsel.

¶ 111    Lastly, defendant argues his trial counsel was ineffective for (7), failing to object when only 10 of the 12 jurors were polled after the verdict. After the verdict was read, the trial court asked defense counsel if he wished to have the jury polled; counsel indicated he did.

The jury was polled, with each juror being asked individually, "Were these your verdicts then and are these your verdicts now?" Each juror answered affirmatively. Two of the jurors were not polled. The State suggests this was inadvertent. Defense counsel did not object to the incomplete polling and failed to raise the issue in defendant's motion for a new trial. Accordingly, we consider this issue under the plain error doctrine. See *Enoch*, 122 Ill. 2d at 186.

¶ 112    Having already found the evidence was not closely balanced, defendant cannot show he was prejudiced by trial counsel's alleged error. See *People v. White*, 2011 IL 109689, ¶ 133 ("[T]he closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced ***."). Likewise, the error does not fall under the second prong of the plain error doctrine. The court's failure to poll the jury on defendant's request is not the kind of error that mandates reversal regardless of whether the defendant was prejudiced by the error because it does not affect the fairness of a defendant's trial or challenge the integrity of the judicial process. *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 26 (discussing the issue as matter of first impression).

> "Although some evidence that the verdict was not unanimous could potentially satisfy the second prong of the plain-error doctrine, defendant in this case has not offered us any evidence that the verdict was not unanimous other than the trial court's failure to poll the jury. *** Without more, defendant cannot meet his burden of persuasion and the second prong of the plain-error doctrine cannot excuse his failure to preserve this issue." *Id*.

The same result is warranted here. The record shows a unanimous verdict. No juror objected when the verdict was announced, the 2 unquestioned jurors were present during the polling and did not voice an objection, the 10 polled jurors' answers did not indicate there was any dissent from the other 2 jurors, and the two verdict forms were signed by all 12 jurors.

¶ 113    Given that the trial court's failure to poll the whole jury was not preserved and Sharp did not satisfy his burden under either prong of the plain error doctrine, Sharp's trial counsel cannot be faulted for failing to object to the court's polling of the jury. Sharp's ineffective assistance of counsel claim based on the jury polling fails.

¶ 114    Defendant argues that the repeated failures of his trial counsel prejudiced him. "[S]heer multiplicity of allegations does not translate into error." *People v. Williams*, 147 Ill. 2d 173, 250 (1991). The record shows Sharp was convicted and sentenced based on overwhelming evidence, not on any alleged deficiencies by his trial counsel. We reject defendant's claims of ineffective counsel.

¶ 115                               Ineffective Assistance of Posttrial Counsel

¶ 116    Sharp claims he was deprived of the effective assistance of counsel during posttrial proceedings and sentencing. Following Sharp's conviction, new counsel appeared to represent him through posttrial proceedings and sentencing. Posttrial counsel appeared on at least three separate occasions over the course of several months before he advised the court he was representing Sharp *pro bono* and requested free transcripts; the court denied the request. Sharp argues his counsel "labored under an apparent misunderstanding that he was entitled to free transcripts" and refused to participate in the posttrial proceedings following the court's denial of his request. Sharp claims posttrial counsel failed to file or argue a

posttrial motion and did not offer any evidence or argument in mitigation at sentencing. Sharp asks that his sentence be vacated and the cause remanded for new posttrial proceedings because he was "effectively deprived of counsel at critical stages of the proceedings." Sharp maintains he "may as well have had no counsel at all."

¶ 117    The State asserts that in raising his claim, Sharp tries to improperly bypass the two-prong *Strickland* standard and rely on the narrow circumstances addressed in *United States v. Cronic*, 466 U.S. 648 (1984).

¶ 118    In *Cronic*, the United States Supreme Court announced a modified formulation of the conventional test for assessing ineffective assistance of counsel. Under *Cronic*, the Supreme Court recognized certain narrow circumstances in which a defendant is entitled to relief under the sixth amendment without having to show actual prejudice because the circumstances rendered the trial "presumptively unreliable." *Id*. at 658-60 (allowing lower courts to presume prejudice from the "complete denial of counsel," among other claims). When a defendant alleges he was denied the assistance of counsel altogether at a critical stage of the proceedings, " ' "[n]o specific showing of prejudice [is] required." ' " *People v. Edwards*, 197 Ill. 2d 239, 251 (2001) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000), quoting *Cronic*, 466 U.S. at 659). In this situation, the prejudice prong of *Strickland* is presumed. *Edwards*, 197 Ill. 2d at 251.

¶ 119    Regarding a complete denial of counsel, as Sharp claims here, we look to the following cases for guidance: *Bell v. Cone*, 535 U.S. 685, 697-98 (2002) (declining to extend presumption to capital case where defense counsel failed to investigate and present mitigating evidence and waived sentencing-phase closing argument); *Roe*, 528 U.S. at 484 (no presumption of prejudice where counsel failed to file notice of appeal; defendant must show he or she would have filed an appeal absent counsel's failure to inform of right); *Smith v. Robbins*, 528 U.S. 259, 288-89 (2000) (same where appellate counsel failed to file merits brief).

¶ 120    We are unpersuaded by Sharp's contention that prejudice should be presumed. We do not agree that this case is the type contemplated by *Cronic* and its progeny.

¶ 121    Posttrial counsel did not entirely fail to oppose the State's position throughout the posttrial proceedings a*s Cronic r*equires. Although counsel failed to obtain additional transcripts, counsel did file a "brief" posttrial motion for a new trial (in addition to the one from defendant's original counsel) and objected to and cross-examined the State's witnesses during the sentencing hearing. Specifically, posttrial counsel argued that without the benefit of the trial transcript he could not argue the motion for a new trial or draft and file a motion to reconsider. In contrast to Sharp's claims that counsel's performance was deficient because he only asked "perfunctory" questions of the State's witnesses during cross-examination and opened the door for the State to introduce damaging testimony, the record shows counsel, although not aggressively, did pursue defendant's interests during the sentencing hearing. During the cross-examination of Detective Banks, posttrial counsel successfully brought out that defendant was not charged with the beating of a certain individual. Among other examples, when Frank White testified defendant shot him, posttrial counsel brought out that White made contradictory statements–one implicating defendant and one not. Accordingly, we will address defendant's claim under the two-prong *Strickland* standard.

¶ 122    To succeed on a claim of ineffective assistance of counsel during sentencing, a defendant must show that counsel's performance fell below minimal professional standards and that a

reasonable probability exists that the defendant's sentence was affected. *People v. Brisbon*, 164 Ill. 2d 236, 246 (1995).

¶ 123    Although Sharp argues counsel's representation was deficient throughout the posttrial proceedings, his main focus is on his claim that counsel failed to subject the State's aggravation to meaningful adversarial testing and counsel's alleged failure to investigate or present any mitigating evidence. Sharp contends that even though his presentence investigative report contained "promising information"–his young age, college course enrollment, work history, and a supportive family–his posttrial counsel developed none of these arguments in mitigation.

¶ 124    Counsel has a duty to investigate potential sources of mitigating evidence or must have a reason not to make such an investigation. *People v. Ruiz*, 132 Ill. 2d 1, 27 (1989). Counsel failed to offer any argument on behalf of defendant and, instead, cited his earlier request for a continuance and stated, "I am not giving any argument because I have not been able to prepare for it."

¶ 125    Posttrial counsel's statement was a classic example of a strategic decision that sought to create a surefire reversible issue. But it is well settled that an appellate court will not second-guess tactical or strategic decisions without evidence that those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. See *Palmer*, 162 Ill. 2d at 476. Sharp provides no such evidence, including on the matter of preparation. Counsel did not explain why he had not been able to prepare for the argument. His statement alone does not constitute sufficient evidence to support the claim of deficient performance. It might just as well have been a ploy to further delay the proceedings.

¶ 126    Oppenheimer's strategic decision to stand on the posttrial motions and to offer no argument during the sentencing phase was within the range of professionally reasonable judgments. We find it particularly telling that the trial judge fairly warned posttrial counsel repeatedly that the posttrial hearing and sentencing would occur regardless of whether counsel secured transcripts from defendant's trial. Counsel was granted several continuances and sufficient time to secure the transcripts, particularly in light of counsel's statements to the court in April that the transcripts had been ordered and he would be able to proceed shortly. (We note the hearing and sentencing did not actually occur until late September.) Counsel might have recognized that the highly experienced judge before whom he appeared would make a thorough review of the mitigation evidence before imposing the sentence, which is exactly what the judge did. Nothing in the record indicates posttrial counsel was anything other than an experienced attorney.

¶ 127    A defense counsel's every error in trial strategy or mistake in judgment does not morph into a deprivation of a constitutional right. Oppenheimer's refusal to supplement the posttrial motions or argue at the sentencing phase is not *per se* ineffective assistance, but a failed strategy, particularly in consideration of the sequence of Oppenheimer's statements to the trial court from the inception of his representation. Under the circumstances, foregoing what might normally be expected and engaging in months of delay and inaction in an attempt to force a reversal on the basis of ineffective assistance of counsel might well have been perceived as the appropriate trial tactic and in Sharp's best interests. That the strategy failed does not make it ineffective assistance of counsel in light of the record before us.

¶ 128    As we noted above, where the disposition of a defendant's claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for postconviction relief. See *People v. Morris*, 229 Ill. App. 3d 144, 167 (1992) (declining to address defendant's ineffective assistance of counsel claim).

¶ 129    In any event, Sharp has failed to make a substantial showing that he was prejudiced by counsel's performance, even were we to find it deficient. To establish prejudice, a defendant must show there is a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. *Strickland*, 466 U.S. at 694. After a careful and thorough review of the record, we find Sharp has failed to prove he suffered any prejudice due to Oppenheimer's conduct. Although counsel failed to offer mitigating evidence on behalf of Sharp, the court was apprised of the evidence through the PSI. Because defendant is unable to show that there is a reasonable probability that, but for counsel's asserted unprofessional errors, the result of the proceeding would have been different, his ineffective assistance of posttrial counsel claim fails.

¶ 130                                        Sentencing

¶ 131    Sharp argues his 55-year sentence does not reflect his rehabilitative potential and, therefore, is an abuse of the trial court's discretion. Sharp contends his sentence forecloses the possibility of rehabilitation because he will be nearly 70 when he is eligible for release.

¶ 132    This issue has been waived. Challenges to defects in a sentencing hearing must be included in a motion for a new sentencing hearing to avoid forfeiture. *People v. Pasch*, 152 Ill. 2d 133, 216 (1992). Sharp waived this issue by failing to object at the sentencing hearing and failing to raise the issue in a motion to reconsider. See *People v. Burt*, 168 Ill. 2d 49, 69 (1995). Sharp acknowledges his counsel did not filed a motion to reconsider the sentence, but claims that because his counsel "was effectively absent from the sentencing proceedings," his claim should not be subjected to the normal rules of forfeiture.

¶ 133    The trial court's sentencing determination is entitled to great deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence and to balance the need to protect society with the rehabilitation potential of the defendant. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). As a reviewing court, we cannot substitute our judgment for that of the sentencing court just because we would have weighed the factors differently. *Stacey*, 193 Ill. 2d at 209. Furthermore, the existence of mitigating factors does not automatically require the sentencing court to reduce the sentence from the maximum. *People v. Powell*, 159 Ill. App. 3d 1005, 1011 (1987).

¶ 134    But, even where the sentence imposed is within the statutory range, we will find an abuse of discretion and reduce the sentence when it is "greatly at variance with the purpose and spirit of the law." *People v. Center*, 198 Ill. App. 3d 1025, 1032 (1990). All penalties are to be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. *People v. Moss*, 206 Ill. 2d 503, 520 (2003). The trial court's decision will not be disturbed absent an abuse of discretion. *People v. Streit*, 142 Ill. 2d 13, 19 (1991).

¶ 135    The trial court chose a sentence authorized by law for the offense of attempted first degree murder. The 25-year sentence Sharp received fell within the statutory range for which he was eligible. 720 ILCS 5/8-4(c)(1) (West 2010) (sentencing range is 6 to 30 years). The

jury also found he personally discharged the firearm which caused Nicholas's injuries, an enhancement from which he could receive 25 years to natural life. 720 ILCS 5/8-4(c)(1)(D) (West 2010). Sharp received 30 years. The record shows the sentencing court considered both the aggravating and mitigating factors presented during the sentencing hearing, including Sharp's criminal history:

> "This Court presided over the trial where the horrific facts came out where the defendant was, in fact, indentified by the father of the victim and the victim where he shot the [victim] in the front porch or front driveway of the victim's house. And then after he had shot him and the victim had fallen down, the defendant proceeded to approach him and continue to shoot him six more times. But for the grace of God he was not successful in killing *** the victim, and the victim survived. And this horrific incident was witnessed by the father and another independent witness. I have read the investigation, pretrial investigation."

The sentencing court found the nature of the offense supported the sentence. We agree.

¶ 136    We find the sentence Sharp received to be proportionate to the serious nature of the offense he committed and consistent with the purpose of the law, including the balancing of the seriousness of the offense with Sharp's rehabilitative potential. We find no abuse of discretion in sentencing.

¶ 137    Defendant also contends the 25-to-life enhancement statute is unconstitutionally vague and asks that this court reduce his sentence, strike or reduce the firearm enhancement or, alternatively, vacate the sentence and remand for resentencing.

¶ 138    A vagueness challenge is a due process challenge that asks this court to examine whether the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she may act accordingly. *People v. Greco*, 204 Ill. 2d 400, 415-16 (2003). Due process requires that a criminal statute "provide explicit standards to regulate the discretion of governmental authorities who apply the law." *People v. Maness*, 191 Ill. 2d 478, 484 (2000). A statute is unconstitutionally vague if its terms are so ill-defined that their meaning will ultimately be determined by the opinions and whims of the trier of fact rather than any objective criteria. *People v. Pembrock*, 62 Ill. 2d 317, 322 (1976). The constitutionality of a statute is "a pure question of law" and, therefore, our standard of review is *de novo. People v. Jones*, 223 Ill. 2d 569, 596 (2006).

¶ 139    Sharp contends the statute contains no criteria to guide judges in selecting a term of years from the broad 25-to-life range, encouraging arbitrary sentencing. Sharp argues that because the sentencing enhancement allows a judge to impose a natural life sentence–the most severe sentence available–to individuals who did not commit murder, "at a minimum, explicit guidance on what factors to consider in determining that such a sentence is warranted" must be included in the statute.

¶ 140    Sharp further argues that in addition to being unconstitutionally vague on its face, the statute is unconstitutionally vague as applied to him. Sharp contends nothing in the record justifies the court's increase beyond the minimum enhancement.

¶ 141    As the State points out, we recently decided this question in *People v. Butler*, 2013 IL App (1st) 120923, *appeal denied*, No. 116420 (Sept. 25, 2013). We held the firearm enhancement statute is not unconstitutionally vague, noting that, although the enhancement allows for a wide range of sentences, there is a clear and definite scope of the sentencing

range–25-to-life–and the trial court has no discretion concerning whether to apply the enhancement. We also found the standards for imposing the enhancement are clearly defined–it must be applied when a defendant commits first degree murder and discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death. *Id.* ¶ 41; see also *People v. Thompson*, 2013 IL App (1st) 113105, *appeal denied*, No. 116832 (Jan. 29, 2014).

¶ 142 We find the reasoning of our recent decisions persuasive and conclude that the 25-to-life firearm enhancement is not unconstitutionally vague. We are also unpersuaded that the statute as applied to defendant was unconstitutional. We affirm defendant's sentence in all respects.

¶ 143                                    Correction of Mittimus

¶ 144 Lastly, defendant contends, and the State concedes, that defendant's mittimus must be amended to reflect the correct offense name, class and statutory citation of his conviction. Sharp was convicted of attempted first degree murder, a Class X offense (720 ILCS 5/8-4(c)(1) (West 2010)). Accordingly, under authority of Illinois Supreme Court Rule 615(b)(1), we order defendant's mittimus be corrected to accurately reflect his conviction: attempted murder, Class X (720 ILCS 5/8-4(a), 9-1(a) (West 2010)). Ill. S. Ct. R. 615(b)(1).

¶ 145                                      CONCLUSION

¶ 146 Affirmed; mittimus corrected.