2020 IL App (1st) 170325-U

FIFTH DIVISION
Order filed: April 10, 2020

No. 1-17-0325

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 14 CR 13119 |
| | ) | |
| | ) | |
| ERICK SANDERS, | ) | Honorable |
| | ) | William Sullivan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justice Rochford concurred in the judgment.
Justice Hall concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:    We affirmed the defendant's conviction and sentence, rejecting his arguments that: he was not proven guilty beyond a reasonable doubt; his 60-year sentence is unconstitutional under both the eighth amendment to the U.S. Constitution and

the proportionate penalties clause of the Illinois Constitution of 1970; and the trial court failed to give due consideration to his age when sentencing him.

¶ 2    The defendant, Erick Sanders, was charged with six counts of first-degree murder, having personally discharged the firearm that caused the death of Carnesha Fort. Following a bench trial, the defendant was found guilty of first degree murder with personal discharge of a firearm and sentenced to 60 years' imprisonment, 35 years for murder plus a 25-year firearm enhancement. On appeal, the defendant argues that the State failed to prove his guilt beyond a reasonable doubt. Alternatively, he argues that, because he was 19 years old at the time of the murder, his sentence is an unconstitutional *de facto* life sentence or, in the alternative, excessive. For the following reasons, we affirm.

¶ 3    The following factual recitation is taken from the evidence adduced at the defendant's trial. On June 6, 2014, at approximately 10:30 p.m., 22-year-old Carnesha Fort was fatally shot in her apartment. Present in the apartment at the time of the shooting were her two young children, eight-year-old Marshaun and three-year-old Trevonte.

¶ 4    At trial, Marshaun, who was then 11 years old, was the State's key witness and provided most of the details surrounding the murder. Marshaun testified that, at about 10:30 p.m., he was watching TV in his room when he heard the doorbell ring. Carnesha called Marshaun to her room. When he entered, she was looking out the window and told him to open the door for the defendant. Marshaun buzzed the defendant through the building door, unlocked the apartment door, and went back to his room. He was familiar with the defendant, also known to him as "E-dub," because the defendant was dating a family member and often spent nights at the apartment. Marshaun had known the defendant for about two months prior to June 2014 and admitted at trial that he did not like the defendant.

¶ 5    Marshaun did not see the defendant enter the apartment, but the defendant looked inside Marshaun's room and then went to Carnesha's room. Marshaun testified that he heard the defendant ask to use the house phone, which was in Carnesha's room. After the defendant used the phone, he waited in the apartment for approximately 10 to 15 minutes. Marshaun told the defendant that his cab was outside, and the defendant left.

¶ 6    Marshaun testified that, approximately three minutes after the defendant left the apartment, he again rang the doorbell. However, Marshaun told the grand jury that the defendant knocked on the door the second time. At trial, Marshaun insisted that Carnesha opened the door for the defendant the second time, but he told the grand jury that he opened the door. Marshaun testified that the defendant claimed he left his phone in the bathroom, but Marshaun told the grand jury that, when the defendant re-entered the apartment, he saw the defendant's phone hanging out of his pocket. At trial, however, Marshaun testified that he never saw the defendant's phone or even knew how it looked.

¶ 7    According to Marshaun, when the defendant re-entered the apartment, he was alone, went to the bathroom, and closed the door for two minutes. When the defendant came out of the bathroom, he looked out the window and gave Carnesha a hug.

¶ 8    Marshaun then heard a single "pop" and smelled a "burning" smell similar to firecrackers. However, Marshaun provided conflicting testimony regarding his location when he heard the "pop" sound. On direct examination, Marshaun said that he was in his room. On cross-examination, Marshaun said he was in the living room. In his grand jury testimony, Marshaun said he was in the kitchen. On re-direct, Marshaun said that he was in the living room walking toward his mother's room.

¶ 9    After the "pop," Marshaun went to his mother's room where the defendant was still present. He looked out her window to determine if the gunshot came from outside. Marshaum testified that Carnesha said to the defendant, "Erick, my kids." The defendant then looked at Marshaun, laughed, and ran out. Marshaun saw his mother fall from the bed to the floor and land on her stomach with blood coming from her mouth. Marshaun again looked out the window in Carnesha's room and saw the defendant leave in a waiting cab. Marshaun then called out to Carnesha's friends across the street and told them that his mother had been shot. They came over and called 911.

¶ 10    When the police arrived, they placed Marshaun and Trevonte in a police car. Marshaun told the police that the man he knew as "E-dub" was involved in the shooting of his mother, and he then remembered that the man's real name was Erick. The police showed Marshaun a photo of the defendant, which he recognized and identified. Marshaun gave more conflicting testimony regarding whether he saw the defendant with a gun. At trial, he testified that he told police and others that he saw the defendant with a gun. However, Detective John Valkner testified that Marshaun never mentioned seeing a gun during their brief interview.

¶ 11    Detective Valkner testified that he was assigned to investigate the shooting and, when he arrived at the apartment at approximately 11:30 p.m., Carnesha had already been taken to the hospital. Detective Valkner spoke with the officer that was with Marshaun and Trevonte, learned the name of a possible suspect, and sent out a flash radio message with the defendant's description. Detective Valkner walked through the apartment and observed a fired 9mm cartridge case in Carnesha's bedroom, a live cartridge on the floor, a large blood stain by the side of the bed, blood splatter on the closet door, and a cell phone on the floor. He also noticed urine in the

toilet and pubic hairs around the rim of the seat. Detective Valkner testified that the urine was sent for forensic testing, but the lab was unable to recover any DNA from it. He was unaware if the hairs were tested. He briefly spoke with Marshaun at 1:00 a.m. Based on this conversation, he issued an investigative alert for the defendant.

¶ 12    The next day, Detective Valkner took Marshaun and Trevonte to the Children's Advocacy Center, where Marshaun participated in a forensic interview about the previous night's events. Detective Valkner observed this interview through a glass window. At trial, the parties stipulated that the interviewer asked Marshaun if he ever saw a gun that night, and he answered no. The parties further stipulated that, in contrast to his trial testimony, Marshaun did not mention seeing a gun during his grand jury testimony.

¶ 13    Following the close of evidence and the arguments of counsel, the trial court found the defendant guilty of murder, having personally discharged a firearm that proximately caused the death of Carnesha. The trial court specifically found that Marshaun's testimony was credible. The court noted that the defense impeached Marshaun on "peripheral areas but did not impeach him concerning the identity of the shooter."

¶ 14    On January 13, 2017, the defendant filed a motion for new trial, arguing, *inter alia*, that he had not been proven guilty beyond reasonable doubt. His motion was denied, and the matter proceeded to sentencing.

¶ 15    At the sentencing hearing, the defendant's presentence investigation report was tendered to all parties and reviewed. In aggravation, Carnesha's brother read a victim impact statement to the court. The State also presented certified copies of the defendant's two prior convictions for Class 4 drug possession and noted that he was never able to complete probation successfully,

was on parole when he committed this offense, and had two pending misdemeanor cases. In mitigation, the defendant's mother testified on his behalf. The court also received numerous character letters from friends and family in support of leniency. Before sentencing the defendant, the trial court stated: "I have considered the factors in aggravation and mitigation."

¶ 16     In sentencing the defendant, the trial court stated: "Given the facts of this case and your background and considering all the factors in aggravation and mitigation, this court finds that a sentence of 35 years on murder is appropriate." The court sentenced the defendant to 35 years for the murder, plus a mandatory 25-year firearm enhancement, for a total of 60 years' imprisonment and three years' mandatory supervised release. His motion to reconsider sentence was denied.

¶ 17     This timely appeal followed.

¶ 18     On appeal, the defendant argues that the State failed to meet its burden of proving his guilt beyond a reasonable doubt because of the conflicting statements in Marshaun's testimony. He also argues that, considering his young age, his *de facto* 60-year life sentence is unconstitutional, or alternatively, excessive. Lastly, he argues that, in fashioning his sentence, the trial court failed to meaningfully consider his youth and rehabilitative potential. We will address each issue in turn.

¶ 19     First, the defendant argues that the State failed to meet its burden of proving his guilt beyond a reasonable doubt. He contends that the State relied almost exclusively on Marshaun's testimony to prove its case-in-chief. The defendant notes that Marshaun was only eight years old at the time of the shooting and provided conflicting statements during the investigation, before the grand jury, and at trial. He contends that these discrepancies make Marshaun's testimony entirely unreliable as to the identity of the shooter. We disagree.

¶ 20     The standard of review on a challenge to the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. The reviewing court will not substitute its judgment for that of the trier of fact on questions involving conflicts in the testimony, the credibility of witnesses, or the weight of the evidence. *People v. Brown*, 2013 IL 114196, ¶ 48. To sustain a conviction, "[i]t is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). All reasonable inferences must be drawn in favor of the prosecution, and the defendant's conviction will be reversed only if the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 21     "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). In assessing identification testimony, we consider the following five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972): (1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of the offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. *Slim*, 127 Ill. 2d at 307-08. None of these factors, standing alone, conclusively establishes the reliability of identification testimony; rather, the trier of fact is to take all of the factors into consideration. *Biggers*, 409 U.S. at 199-200. In addition to the *Biggers* factors, courts also consider whether the witness was acquainted with the defendant

before the crime, and whether there were any suggestive procedures used to make the identification. *People v. Brooks*, 187 Ill. 2d 91, 129-30 (1999).

¶ 22    Applying these factors to the present case, we conclude that a rational trier of fact could find that Marshaun reliably identified the defendant. Regarding the first and second factors, Marshaun had ample opportunity to observe the defendant and exercised a high degree of attention. Per his testimony, the defendant was well-known to Marshaun, having often stayed at the apartment while he was dating a family member. Marshaun also testified that he observed the defendant on multiple occasions on the night in question, including when he entered his mother's room after hearing a "pop" sound. According to Marshaun, he entered his mother's room and the defendant was still there. He heard his mother say "Erick, my kids" and then the defendant looked at him, laughed, and ran out of the apartment. At that point, Marshaun discovered that his mother had been shot. He looked out of the nearby window and saw the defendant enter a cab. Given Marshaun's familiarity with the defendant, his multiple opportunities to observe the defendant, and the level of detail in Marshaun's testimony, we conclude that the first two factors support the reliability of the identification.

¶ 23    The third factor, the accuracy of Marshaun's prior description of the defendant, is not relevant as Marshaun did not provide a description to the police, but, rather, provided the name "E-dub" and later the name Erick. However, regarding the fourth factor, the record shows that Marshaun never waivered in his identification of the defendant as the shooter. Marshaun consistently and repeatedly identified the defendant as the shooter during the investigation, during his grand jury testimony, and at trial.

¶ 24    Turning to the fifth and final factor, the record shows that Marshaun identified the defendant almost immediately after the shooting occurred. Marshaun testified that, when the police arrived, he provided them with the names "E-dub" and "Erick" and identified the defendant from a photograph. Detective Valkner likewise testified that, when he arrived, he spoke with the officer that was with Marshaun and Trevonte and learned the name of a possible suspect and sent out a flash radio message with the defendant's description. Based on the foregoing, we conclude that the relevant *Biggers* factors support the trial court's determination that Marshaun reliably identified the defendant. Because the identification was positive and reliable, this evidence alone is sufficient to sustain the defendant's conviction. See *Slim*, 127 Ill. 2d at 307.

¶ 25    The defendant relies on *People v. Williams*, 383 Ill. App. 3d 596 (2008), to support his argument that his conviction should be reversed. In *Williams*, the only evidence linking the defendant to the charge of aggravated kidnapping was the testimony of two minors, aged 9 and 11. *Id.* at 637. The court found that, even after "substantial prodding through vigorous leading questions" their testimonies were still hesitant, vague, and riddled with internal inconsistencies. *Id.* at 638. Moreover, the court found that these inconsistencies were "materially essential to the identification of the defendant." *Id*. at 649. The nine-year-old initially testified that he saw the defendant inside a basement. *Id*. at 638-39. He then admitted that his eyes were duct taped, and he could not see the defendant or inside the basement. *Id*. at 639. He later changed his testimony and stated that he could see the defendant in the basement. *Id*. Finally, he stated that he did not see the defendant in the basement, but instead saw him in a car. *Id.* Additionally, he twice failed to identify the defendant in court and then ultimately identified him in an inconsistent manner.

*Id.* at 641. The 11-year-old's testimony was similarly unreliable; his in-court identification of the defendant came only after the prosecutor pointed at the defendant and asked if "it [was] this man?" *Id.* at 642.

¶ 26    We find that *Williams* is significantly distinguishable from the facts presented in the case at bar. Unlike the witnesses in *Williams*, Marshaun's identification testimony was clear and consistent. There was never any doubt or conflict in his testimony regarding the identification of defendant as the shooter. Marshaun had clear, unobstructed views of the defendant the night of the shooting, and he did not demonstrate any difficulty in identifying the defendant in court. Also, unlike in *Williams*, Marshaun's inconsistent statements, such as whether he saw a gun or his location in the apartment when he heard the "pop," were not essential to his identification of the defendant, whom he was previously acquainted with prior to the shooting. We find that the discrepancies between Marshaun's grand jury testimony and his trial testimony concerned "peripheral areas" and were not fatal to his identification testimony or credibility. We note, again, that credibility issues, resolution of conflicting or inconsistent evidence, weighing the evidence, and making reasonable inferences from the evidence are all reserved for the trier of fact, and we will not overturn a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Davis*, 2018 IL App (1st) 152413, ¶ 55.

¶ 27    The defendant also suggests that Marshaun's testimony was unreliable because Marshaun admitted at trial that he did not like the defendant. The argument is unpersuasive as we have already determined that Marshaun's identification of defendant as the shooter was reliable and

credible. Based upon the foregoing analysis, we find that the evidence in this case was sufficient to sustain the defendant's conviction beyond a reasonable doubt.

¶ 28   Next, the defendant argues that his 60-year sentence is unconstitutional and excessive. Specifically, the defendant argues that the trial court abused its discretion when it imposed a *de facto* life sentence without considering his youth or rehabilitative potential in violation of the eighth amendment to the U.S. Constitution. He contends that the protections afforded to juveniles in *Miller v. Alabama*, 567 U.S 460 (2012), extend to young adults just over the age of 18. We find no merit in the argument.

¶ 29   The eighth amendment prohibits, *inter alia*, the imposition of cruel and unusual punishment, including excessive sanctions. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). In *Miller v. Alabama*, the Supreme Court held that a sentence of "mandatory life without parole for those under the age of 18 at the time of their crimes" is a violation of this prohibition. *Miller*, 567 U.S at 465. In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court expanded *Miller* protection to "discretionary sentences of life without parole for juvenile defendants." However, the supreme court noted that "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *People v. Harris*, 2018 IL 121932, ¶ 61. In *Harris*, our supreme court held that "for sentencing purposes, the age of 18 marks the present line between juveniles and adults." *Id*. Since the defendant in the present case was over 18 years old when he shot Carnesha, in accordance with *Harris*, his challenge to his 60-year sentence under the eighth amendment fails.

¶ 30   Next, the defendant argues that his 60-year sentence violates the proportionate penalties clause of the Illinois Constitution of 1970. We believe that the argument is premature.

¶ 31    The defendant's proportionate penalties argument derives from article I, section 11 of the Illinois Constitution of 1970. *People v. Williams*, 2015 IL 117470, ¶ 9. Article I, section 11 provides that " '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *Williams*, 2015 IL 117470, ¶ 9 (quoting Ill. Const. 1970, art I, § 11). A proportionate penalties challenge can be raised on the basis that the penalty for a particular offense is too severe under the cruel or degrading standard or that the penalty is harsher than the penalty for a different offense that contains identical elements. *Williams*, 2015 IL 117470, ¶ 9.

¶ 32    The defendant contends that his sentence violates the proportionate penalties clause because sentencing him to die in prison without any "appreciable" consideration of his youth or background is the kind of sentence that "shocks the moral sense of the community." The defendant notes that he had a minimal and non-violent criminal background and strong family support. He further asserts that the trial court specifically found that he had the capacity to be rehabilitated but failed to act on that finding.

¶ 33    The defendant's proportionate penalties challenge is an "as-applied" constitutional challenge. "[A]n as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *Harris*, 2018 IL 121932, ¶ 38. Although the defendant in *Harris* failed to raise his proportionate penalties challenge in the trial court, he, nevertheless, maintained that the record was sufficient to consider his claim that his mandatory 76-year sentence violated the proportionate penalties clause. *Id.*, ¶ 36. The supreme court found the record insufficient to address the defendant's proportionate penalties challenge, explaining that "[a]ll as-applied constitutional challenges are, by definition,

dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." (Internal quotation marks omitted.) *Id.*, ¶ 39. The court in *Harris* determined that "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Id.*, ¶ 41.

¶ 34　Because the defendant in *Harris* failed to raise his as-applied constitutional challenge in the trial court, the record did not contain any evidence on how the evolving science on juvenile maturity and brain development that formed the basis for the Supreme Court's decision in *Miller* applied to him as an adult. Therefore, the court determined that the defendant's as applied challenge was premature. *Id.*, ¶ 46.

¶ 35　The supreme court in *Harris* declined the defendant's request for remand to the trial court for an evidentiary hearing. Instead, the court determined that the defendant's claim was more appropriately raised in another proceeding, such as a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) or a petition under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)). *Harris*, 2018 IL 121932, ¶ 48. The court pointed out that the Act was designed to resolve constitutional issues, particularly those that depend upon facts not found in the record. *Id.*, ¶ 8; see *People v. Vega*, 2018 IL App (1st), 160619, ¶¶ 57, 58 (citing *Harris*, this court held that, in the absence of an evidentiary hearing, the defendant's proportionate penalties challenge was premature and more appropriately raised in a postconviction petition).

¶ 36    Like the defendant in *Harris*, the defendant in this case failed to raise a proportionate penalties challenge to his sentence in the trial court. No evidentiary hearing was held, and no findings of facts were made by the trial court. In accordance with *Harris* and *Vega*, we conclude that the defendant's proportionate penalties claim would be more appropriately raised in proceedings under the Act or under section 2-1401 of the Code.

¶ 37    The recent decision of this court in *People v. House*, 2019 IL App (1st) 110580-B, does not require a different result. In that case, the appeal was from the dismissal of the defendant's postconviction petition. Unlike the defendant in *Harris* and the defendant in the present case, in *House*, the defendant had consistently challenged his mandatory natural life sentence by a motion to reconsider sentence in the trial court, on direct appeal, and in postconviction proceedings, the forum suggested by the supreme court in *Harris*. Therefore, his claim was not premature. *House*, 2019 IL App (1st) 110580-B, ¶ 32.

¶ 38    Finally, the defendant argues that the trial court abused its discretion in sentencing him to 60 years' imprisonment. He contends that the trial court failed to take into consideration his youth and rehabilitative potential and requests that we either reduce his sentence or vacate his sentence and remand the matter for resentencing. We decline to do either.

¶ 39    Trial courts have broad discretion in imposing sentences and those sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The trial court is in a superior position to determine the appropriate sentence because of its opportunity to weigh the defendant's credibility, demeanor, moral character, mentality, social environment, habits and age. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). Thus, a reviewing court should not substitute its judgment simply because it would have weighed these factors differently. *People v. Stacy*, 193

Ill. 2d 203, 209 (2000). Additionally, the trial court must fashion a sentence based upon the particular circumstances of the individual case, including the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 55 (2000).

¶ 40 A reviewing court will not disturb the trial court's sentencing decision absent an abuse of discretion. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 134. Where, as here, the defendant's sentence falls within the prescribed statutory limits, the reviewing court will not find an abuse of that discretion unless the sentence is greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense. *People v. Means*, 2017 IL App (1st) 142613, ¶ 14. "A sentence must reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship." *Vega*, 2018 IL App (1st) 160619, ¶ 68. In fashioning a sentence, the trial court must not ignore relevant mitigating factors or consider improper aggravating factors. *People v. Flores*, 404 Ill. App. 3d 155, 157 (2010). However, the seriousness of the offense, and not mitigating evidence, is the most important sentencing factor." *Vega*, 2018 IL App (1st) 160619, ¶ 68.

¶ 41 The defendant was convicted of first degree murder, for which the sentencing range is from 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2016). In addition, the trial court is required to impose a sentence enhancement of 25 years up to a term of natural life if the defendant personally discharged a firearm that proximately caused death. 730 ILCS 5/5-8I(a)(l)(d)(iii) (West 2016). Here, the trial court found that the defendant personally discharged the firearm that proximately caused Carnesha's death. The defendant was sentenced to 35 years' imprisonment for the murder plus 25 years for the firearm enhancement, resulting in a total sentence of 60 years' imprisonment.

¶ 42    Although the defendant's sentence of 35 years' imprisonment for murder with a 25-year enhancement is 15 years above the 45-year minimum, it is well within the statutory sentencing range. Given the nature of the offense, we do not believe that the sentence is manifestly disproportionate. Here, the evidence established that the defendant shot Carnesha at close range in her apartment while her two young children were present.

¶ 43    Nevertheless, the defendant contends that the trial court failed to take into consideration his youth and rehabilitative potential in arriving at his sentence, and as a consequence, we should either reduce his sentence or vacate his sentence and remand the matter for resentencing.

¶ 44    An adult defendant's age is one factor for consideration by a trial court in fashioning an appropriate sentence. *People v. Charleston,* 2810 IL App (1st) 161323, ¶ 23. The trial court is presumed to have considered all relevant factors in fashioning a sentence and that presumption will not be overcome without explicit evidence that the trial court failed to consider mitigating factors. *Flores*, 404 Ill. App 3d at 158. There is no such explicit evidence in the record before us that the trial court failed to consider the defendant's youth and rehabilitative potential when sentencing him.

¶ 45    Before imposing sentence, the trial court heard the testimony of the defendant's mother and received numerous character letters from friends and family in support of leniency. The court was in possession of a presentence investigation report, which contained the defendant's age and background. The court even specifically mentioned that the defendant did not come from a bad background and had rehabilitative potential. Moreover, before sentencing the defendant, the trial court specifically stated, twice, that it had considered "all the factors in aggravation and mitigation." There is no explicit evidence in the record before us that the trial court failed to

consider either the defendant's age or rehabilitative potential when sentencing him. See *Flores*, 404 Ill. App 3d at 158. Nor do we find anything in the record that would justify our reducing the defendant's sentence or vacating his sentence and remanding the matter for resentencing.

¶ 46    Based upon the foregoing analysis, we conclude that the trial court did not abuse its discretion when it sentenced the defendant to 35 years' imprisonment for the murder plus 25 years for the firearm enhancement, resulting in a total sentence of 60 years' imprisonment.

¶ 47    Having rejected each of the defendant's arguments, we affirm both his conviction and sentence.

¶ 48    Affirmed.

¶ 49    JUSTICE HALL, partially dissenting:

¶ 50    I concur in the affirmance of the defendant's conviction.  I respectfully disagree with the majority's holding regarding defendant's contention that the trial court did not give proper consideration to his age when sentencing him.

¶ 51    "A sentence must reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship." *Vega*, 2018 IL App (1st) 160619, ¶ 68.

¶ 52    In mitigation, the trial court noted that defendant had strong family support and received over 12 letters from his family and friends attesting to his character and value to both his family and the community.  Defendant was also helping to raise his three-year old daughter.  The court found that if defendant chose to make efforts towards rehabilitation, he could be rehabilitated because of his supportive family.

¶ 53    The trial court's comments regarding defendant's rehabilitative potential did not include a specific consideration of defendant's age. Defendant was 19 years old at the time of the

shooting. Though technically not a juvenile, defendant's "choices" may be considered to be reflective of his youth and immaturity. I believe that any consideration of the objective of rehabilitative potential necessitates that a trial court consider the defendant's youth, along with the extensive research on juvenile maturity and brain research that led to the Supreme Court's decision in *Miller.* While age is only one of the factors in mitigation to be considered, here there is no indication that the trial court considered whether defendant made those choices it decried due to his age. I would vacate defendant's sentence and remand the matter to the trial court for resentencing for consideration of defendant's youth. Although not precedential authority, this justice would note that this very division has previously remanded for resentencing to consider a defendant's youth in a Rule 23 case, *People v. Wilburn*, 2019 IL App (1st) 153196-U*,* consistent with this dissent.