2025 IL App (1st) 232190-U
No. 1-23-2190
Order filed September 30, 2025

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) ) | No. 11 CR 12357 |
| KEYSHON SHARP, | ) ) | The Honorable |
| Defendant-Appellant. | ) ) ) | Geraldine A. D'Souza, Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Gamrath concurred in the judgment.

**ORDER**

¶ 1        *Held:* Denial of postconviction petition after a third-stage evidentiary hearing was proper where court's findings that two witnesses who testified at third-stage evidentiary hearing were not credible was not against the manifest weight of the evidence; issue of trial counsel's ineffectiveness was resolved on direct appeal and thus barred by *res judicata*; appellate counsel was not ineffective for failure to raise non-meritorious issues; and petitioner did not meet his burden to establish a pattern or practice of police malfeasance.

¶ 2        The State charged Keyshon Sharp with multiple offenses, but before trial, it dismissed all

counts except for attempted first degree murder and aggravated battery with a firearm. His first

jury trial ended in a mistrial. In the second trial, the jury found Sharp guilty of attempted first degree murder and aggravated battery with a firearm, resulting in a 55-year sentence.

¶ 3 On direct appeal of the second trial, Sharp raised, among other grounds, ineffective assistance of trial counsel for failing to call two defense witnesses. We affirmed his conviction and sentence in *People v. Sharp*, 2015 IL App (1st) 130438.

¶ 4 Sharp then filed a postconviction petition claiming actual innocence, which went to a third-stage evidentiary hearing. At the close of the hearing, the trial court denied the petition. Sharp now appeals.

¶ 5 We affirm. The evidence did not show that a retrial would "probably" change the outcome, and the court found two witnesses at the evidentiary hearing to be not credible. *Res judicata* bars our consideration of the issue of trial counsel's ineffectiveness, which we resolved in Sharp's direct appeal. *Sharp*, 2015 IL App (1st) 130438, ¶¶ 5, 106-108. Regarding appellate counsel, under the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984), appellate counsel was not required to raise non-meritorious issues. *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Finally, the evidence did not establish a pattern or practice of police malfeasance.

¶ 6 Background

¶ 7 On a late June afternoon in 2011, Nicholas Coleman was shot in the front yard of his home in Harvey, Illinois, while his father, Joseph, sat in a car in the driveway. Both men later identified Keyshon Sharp as the shooter.

¶ 8 A trial in 2012 resulted in a hung jury. Sharp did not testify. At the close of its case, defense counsel requested a continuance to present new evidence about the "real offender," claiming Emani Fort and Mercedes Green would testify that Ronald Jackson admitted responsibility for the shooting. The court denied the request, citing concerns over the reliability of this evidence. *Sharp*,

2015 IL App (1st) 130438, ¶ 15. The jury's failure to reach a verdict resulted in a mistrial and a subsequent retrial.

¶ 9        We set out the relevant evidence presented to the jury in the second trial.

¶ 10       Around 5 p.m. on June 21, 2011, Coleman arrived home with his father, Joseph. They saw Sharp standing by a fence near the house. Coleman recognized Sharp, with whom he had never had any issues, so he believed Sharp was "just walking by."

¶ 11       Coleman's dog was on the other side of the fence. As Sharp walked toward Coleman's house, he asked Coleman about his dog. Sharp stood just 10 feet away from Coleman, face-to-face. Coleman was close enough to see Sharp bite his lip and reach for his hip.

¶ 12       From the car, Joseph saw Sharp make a motion as if to "hug" Coleman before pulling out a gun. Coleman saw the gun pointing at him. Sharp fired, but Coleman was not hit and ran. Sharp chased after him while Joseph rushed into the street to seek help.

¶ 13       Sharp then shot Coleman in the back of the leg. Joseph saw his son fall to the ground, turn over onto his back, and cover his head with his arms. Coleman testified that he could see Sharp shooting directly at him and that he could see Sharp's face clearly. After Sharp stopped firing, he jumped over the fence toward an alley behind the Coleman house. A bystander called 911.

¶ 14       Joseph watched as Sharp aimed and fired repeatedly at Coleman. Joseph saw Sharp come out of the alley and approach the car of Mauryce Brown, his next-door neighbor,

¶ 15       Brown testified he was around the corner when he heard four or five gunshots. About 30 seconds after the last shot, Sharp asked to "get in" his car. Seeing that Sharp had a gun, Brown refused. Sharp then fled. Brown drove over to assist Coleman, who was lying on the ground.

¶ 16        Detective Jason Banks arrived within 10 minutes of the shooting and spoke with Brown, who identified the shooter as "Baby Stone" and believed his name was "Keyshon." Brown informed Banks that he had seen Sharp with a gun right after the shots were fired.

¶ 17        The next day, Banks prepared a photographic array that included Sharp's photo. Brown identified Sharp. Joseph viewed the same photo array but did not identify anyone in it.

¶ 18        On July 7, Banks interviewed Coleman at the hospital. Coleman indicated that "Baby Stone" shot him. Banks showed Coleman a photo array, and Coleman identified Sharp.

¶ 19        A few days later, Sharp turned himself in to the police, claiming that he was picking up his sister's children at their day care center the day of the shooting. That same day, Banks conducted a physical lineup. Brown, Coleman, and Joseph separately identified Sharp as the shooter.

¶ 20        Coleman sustained wounds to his calf, thigh, groin, chest, elbow, neck, and under his arm. He underwent surgery for a tracheotomy and to repair the damage to an artery. For two weeks, he could not speak or eat. When he was released from the hospital, Coleman experienced difficulty breathing and couldn't talk in complete sentences without pausing for breath.

¶ 21        *Direct Appeal*

¶ 22        At the first trial, Sharp's defense argued he was at the daycare at the time of the shooting. Three alibi witnesses testified on his behalf: a daycare employee, Kenneth Woods; Sharp's sister, Katrina Sharp; and Curtis Anderson, a friend who spent time with Sharp before Sharp allegedly left for the daycare center. Neither Sharp's sister nor Anderson testified at the second trial.

¶ 23        Woods confirmed that four of Katrina Sharp's children attended the center. He described the center's procedures, which required children to be signed in and out daily by an authorized person. Woods identified a sign-in/out sheet, dated June 21, 2011, showing Keyshon Sharp signing the children out at 5:30 p.m. Woods said that he had no personal knowledge of who signed in or

out on any particular day. The center kept the sheets on a table, and they remained available for a month so anyone could fill out a sheet at a later date. Woods added that Sharp was not authorized to pick up the children and other sign-out sheets for Sharp's nieces and nephews were blank.

¶ 24 During the sentencing hearing, the prosecutor argued, "When you look at the factors in aggravation presented *** the fact that there is a component that must be demonstrated by this Court to the Black P. Stone Nation that they don't run the streets in this district, and that people like Keyshon Sharp, ranking gang members, can't walk up to you in your front yard and shoot you for no reason." The trial court sentenced Sharp to 55 years in prison.

¶ 25 On appeal, Sharp raised several issues, among them ineffective assistance of counsel for failure to call his sister and Anderson. *Sharp*, 2015 IL App (1st) 130438, ¶¶ 5, 106-108. We rejected this claim, finding that the trial counsel conducted a thorough investigation of the potential defense witnesses and made a strategic decision not to call them. The court noted that neither his sister nor Anderson did well during cross-examination in the first trial. *Id.* ¶ 107. We concluded that Sharp failed to demonstrate ineffective assistance, as defense counsel reasonably chose not to present weaker cumulative evidence from Sharp's sister and Anderson. *Id.*

¶ 26 *Postconviction Petition*

¶ 27 In January 2018, Sharp petitioned for postconviction relief, claiming actual innocence, ineffective assistance of trial and appellate counsel, and a due process claim based on police misconduct. During the second stage proceedings, the postconviction court granted Sharp leave to subpoena the Harvey Police Department for complaints filed against Detective Banks. After several months of no response from the Department, Sharp elected to move forward without that material. He amended his petition, adding affidavits from Curtis Anderson, Mauryce Brown, Michael Brock, and Ubeka Brock, which were admitted into evidence. Also admitted into evidence

was an amended complaint filed by a plaintiff unrelated to this case (Erza Hill) against the City of Harvey, Deputy Chief Jason Banks, and others, claiming, among other things, malicious prosecution.

¶ 28        Anderson only testified at Sharp's first trial. Brown testified at the trials but was deceased at the time of the evidentiary hearing. Michael Brock and Ubeka Brock, unrelated, were new witnesses.

¶ 29                              *Evidentiary Hearing*

¶ 30                              Actual Innocence

¶ 31        Michael Brock testified that he had known Sharp for about 10 years, having lived in the same neighborhood. On the afternoon of the shooting, Brock was sitting in a car with a woman, watching a basketball game in a nearby park. He heard at least four gunshots and saw a man with a short haircut and dark skin standing in a driveway, shooting before fleeing. Although he heard someone yelling, he focused on the shooter and the direction he ran. After seeing the shooter leave the area, Brock and the woman drove away.

¶ 32        Brock testified that the shooter was not Sharp, but rather a man named "Ron." Brock never spoke to the police or the State's Attorney's office about what he witnessed because he did not want to get involved. When he learned of Sharp's conviction, he did not come forward. But, in May 2018, he signed an affidavit describing what he knew about the shooting. Brock said he took this action having gone through a similar experience and knew Sharp had not committed the crime.

¶ 33        On cross-examination, Brock confirmed that he was incarcerated for murder. He stated that the shooting occurred in a driveway and that his view was unobstructed. Brock explained that he did not look directly at the gun because "when you hear gunshots, you're just trying to make sure

that you're not the one that is getting shot at." He became aware of Sharp's arrest within a year of the shooting. Brock said he didn't see Sharp while they were incarcerated in the Cook County Jail.

¶ 34     The State questioned Brock about his comment regarding his dislike of Sharp due to a "past history," which referred to altercations or "bad blood" between them. Brock was incarcerated at Western Illinois Correctional Center at the same time as Sharp, but they did not converse and resided on different wings. Additionally, the two did not discuss the case while being transported for the evidentiary hearing, and Sharp did not ask Brock to write the affidavit.

¶ 35     Ubeka Brock, 15 years old at the time, testified that he was riding his bike to a park in the neighborhood when he heard loud noises. As he continued on his way, he saw a man holding a black gun and standing over another man, and realized what was happening. Frightened, he rode straight to his cousin's house. The man with the gun was taller than Ubeka, who stood 5'10".

¶ 36     Ubeka never informed anyone about what he had seen. Then, around 2016, while he and Sharp were incarcerated, he met Sharp, who told him about his conviction. Ubeka realized that it was for the shooting he had seen. Knowing "for a fact" that Sharp was not the shooter, he decided to come forward and prepared, typed, and signed the affidavit after his release from prison in 2018.

¶ 37                              Ineffective Assistance of Counsel

¶ 38     Curtis Anderson testified that he was called as a witness in the first trial but not for the second. He had known Sharp for about 20 years by the nicknames "Little Key" and "Baby," but not "Baby Stone." On the day of the shooting, Anderson had gotten off work early and spent time with 10 people, including Sharp, smoking marijuana and drinking beer.

¶ 39     Later, Sharp asked Anderson to take him to a daycare center, where they picked up two children and brought them to a house near 167th and Kedzie. Only Sharp got out of the car at the daycare, taking about 10 minutes to retrieve the children. Anderson recalled they were at the

daycare before sunset, but admitted his memory was hazy due to drinking. He could not recall who else accompanied him and Sharp that day, although he remembered someone else in the car.

¶ 40        Sharp's attorney contacted Anderson before the second trial, and someone he thought was a Cook County official picked him up to testify. While on their way to the courthouse, the individual received a call and returned Anderson to work. Anderson recognized his signature on the affidavit but was unsure if he had read it, as too much time had passed.

¶ 41        On cross-examination, Anderson testified about his several felony convictions. He confirmed that he had testified previously that he had never heard Sharp referred to as "Baby Stone." The State impeached Anderson with his testimony from the first trial, where Anderson had been asked if he knew Sharp as "Baby Stone," and answered, "I've heard that." Anderson explained, "We call him Baby, so where the 'Stone' come from, I'm a little confused."

¶ 42        Anderson agreed that at the first trial, when his memory was fresh, he might have testified that they began hanging out at 11:00 a.m. before being asked him to accompany him to the daycare center. Anderson did not know what time the shooting occurred.

¶ 43                                    Police Misconduct

¶ 44        Rodney Bowles testified that he had known Sharp for 20 years. In 2011, Bowles was a victim of an assault and taken to Christ Hospital. There, Detective Banks and another officer from the Harvey Police Department interviewed him while he was under the influence of pain medication and felt "out of it." Family members and Sharp were present, and Bowles requested that Banks direct his questions to Sharp. A short time later, Banks returned and told Bowles that he should say that Sharp had beaten him up. Banks even threatened to charge him with a crime if he would not comply, but Bowles refused to lie. No one was charged in the assault.

¶ 45        Despite suffering a head injury that affected his memory, Bowles recalled going with Sharp to the daycare center in June 2011, along with someone nicknamed "Blow Way." Later, Banks and another police officer stopped Bowles and asked if he knew about the shooting. Bowles told them he did not remember.

¶ 46        In 2019, Bowles executed an affidavit stating he could still recall events from 2011. But during his testimony in June 2023, he said that his memory was worsening, and he could not recall whether he had typed the affidavit.

¶ 47        After the defense witnesses testified, the parties stipulated to Mauryce Brown's affidavit.

¶ 48        In a written ruling, the postconviction court denied Sharp's petition. The court found that the two witnesses supporting Sharp's claim of actual innocence were not credible. Michael Brock, a convicted felon, never came forward until he was convicted of first degree murder and developed a friendship with Sharp in prison. He contradicted himself on the stand, initially saying that he had no issues with Sharp, while his affidavit claimed that he did not come forward sooner because he had issues. He also contradicted himself by testifying that he never spoke to others about what he saw the day of the shooting, despite his affidavit stating that he had discussed the shooting with others yet chose not to alert the authorities.

¶ 49        Ubeka Brock, who claimed he observed the shooting, testified that he had blocked the shooting "out of his mind due to the trauma it caused him." Nonetheless, after befriending Sharp in prison, he said his memory returned.

¶ 50        Taking account of the contradictions, claims, demeanor, and body language of both Michael Brock and Ubeka Brocks, the court concluded that "the defense has not met their burden in showing that this newly discovered evidence could possibly change the outcome at a retrial."

¶ 51 Regarding Brown's affidavit, the court noted that he provided a statement at the time of the shooting and testified before a grand jury as well as during the second trial. The court determined that Brown's initial handwritten statements and his grand jury and trial testimonies were strong and consistent, while his affidavit was weak on details. (The court erroneously indicated that the affidavit was notarized almost one year later.) The court concluded that Brown's "strong prior testimony makes it unlikely to change the result at a retrial when the individual is deceased and only the prior statements could be admitted at a retrial."

¶ 52 The court also determined that the decision not to call Anderson and Katrina Sharp involved trial strategy and did not believe this indicated that counsel's performance fell below an objective standard of reasonableness or resulted in prejudice. See *Strickland v. Washington,* 466 U.S. 668 (1984) ( relevant standard).

¶ 53 Finally, the court rejected the due process claim based on Bowles' testimony, noting his traumatic brain injury. The court emphasized Bowles' confusion during his testimony and the numerous instances he admitted to having a faulty memory. The court found, "Due to his statements, his demeanor and body language at the hearing, the defense fails woefully below their burden of showing a pattern or practice of malfeasance."

¶ 54 The court denied the petition, holding that Sharp failed to satisfy his burden to prove the allegations "by a preponderance of the evidence or to make a substantial showing of a constitutional violation." See *People v. Rovito*, 327 Ill. App. 3d 164 (2001).

¶ 55                                     Analysis

¶ 56                               *Actual Innocence*

¶ 57 Generally, for new evidence to be sufficient for granting a defendant a new trial, it must meet three criteria: (i) of a conclusive character that would probably change the result on retrial,

(ii) material, not merely cumulative, and (iii) discovered after the trial and be of a nature that the defendant could not have discovered it earlier through due diligence. *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). When a postconviction petition claims actual innocence based on new evidence, the evidence need not definitively establish the petitioner's innocence. *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1034 (2011). Instead, a new trial is warranted when the circumstances, including the new evidence, deserve closer scrutiny on the issue of guilt or innocence. *Id.*

¶ 58 At a third-stage evidentiary hearing, the trial court determines witness credibility, weighs testimony and evidence, and resolves evidentiary conflicts. *People v. Domagala,* 2013 IL 113688, ¶ 34. Because the trial court is responsible for deciding the facts, the reviewing court considers the trial court's decision to deny relief for manifest error. See *People v. Reed*, 2020 IL 124940, ¶ 51; *People v. Caldwell*, 2023 IL App (1st) 221586, ¶ 17 (quoting *People v. English*, 2013 IL 112890, ¶ 23) ("Where factfinding and credibility determinations are involved, we review the court's decision for manifest error."). Manifest error is clear, obvious, and indisputable, or when the opposite conclusion is plainly evident. *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 59 Substantively, a court should grant relief only if the supporting evidence is "new, material, noncumulative, and of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 84. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* ¶ 97.

¶ 60 After examining the record and listening to oral argument, we cannot say that the trial judge's decision to reject Michael Brock's and Ubeka Brock's testimony was manifestly erroneous. Sharp's arguments regarding their credibility may be plausible (for example, they were both disinterested witnesses), but "plausibility is not the test on review." *Morgan*, 212 Ill. 2d at 161. This

court reviews "whether the new evidence was sufficiently compelling that a decision by the trial court to reject that evidence was manifestly erroneous." *Id.*

¶ 61      Michael Brock explained that, on learning that Sharp was arrested and convicted for this shooting, he remained silent because he was "trying not to become involved." He shared details about what he had seen with a few people but never reported it to the police. In oral argument, Sharp's counsel asserted the postconviction judge made "mistakes of fact" regarding Michael Brock's testimony; specifically, the judge "misconstrued" the nature of the relationship between Michael Brock and Sharp, questioning whether they were "friends or foes" in the past.

¶ 62      Ubeka Brock, a teenager at the time, was riding his bike when he witnessed a part of the incident and also did not tell anyone about it for years. Sharp reiterates the details provided by the Brocks, including the streets they traveled, the park located near the shooting scene, what they witnessed, and who they did or did not see during the shooting.

¶ 63      Sharp argues that the inconsistencies in Ubeka's testimony did not affect his credibility. A 15-year-old who witnessed a crime might understandably block out the memory, and his reasons for coming forward after meeting Sharp while incarcerated are not inherently unbelievable. Sharp maintains that Ubeka was able to describe (i) the route he took the day of the shooting, (ii) the shooter, and (iii) why he made the decision not to come forward. But these subjective descriptions and memories do not sufficiently contradict the eyewitnesses who testified at trial.

¶ 64      The limited nature of the Brocks' observations does little to challenge the strong eyewitness identification at trial. The court acted reasonably in questioning their credibility, given that they had waited years to come forward, and then only after connecting with Sharp in prison.

¶ 65      This court defers to the postconviction court as the factfinder. In its written ruling, the court found both Brocks not credible, noting "the impeachment which led to the contradictions made on

the stand, and the sheer absurdity of some of the claims, as well as the demeanor and body language of the two witnesses."

¶ 66    The trial testimony from Coleman and his father was credible and not outweighed by the testimony from the Brocks. We agree with the postconviction judge that Sharp has not met his burden that the newly discovered evidence could possibly change the outcome at a retrial. The postconviction court had the benefit of observing the witnesses' demeanor during examination and assessing their testimony against the other evidence. *Morgan*, 212 Ill. 2d at 162. Nothing in the record before us undermines the judgment in this case. *People v. Reed*, 2020 IL 124940, ¶¶ 53-54.

¶ 67                                  *Ineffective Assistance of Counsel*

¶ 68    Sharp contends that the trial court erred by denying him postconviction relief based on ineffective assistance of trial and appellate counsel. The State argues that (i) Sharp's ineffective assistance of trial counsel claim was barred by *res judicata*, and (ii) Sharp's appellate counsel "employed a reasonable strategy" in presenting the issues on direct appeal.

¶ 69    Whether the claim of ineffective assistance of counsel relates to trial or appellate counsel, we review under the familiar *Strickland* standard of performance and prejudice.

¶ 70                                           Trial Counsel

¶ 71    Sharp contends his trial counsel was ineffective on several grounds, including the failure to present two alibi witnesses who had testified at his first trial, Katrina Sharp and Anderson.

¶ 72    Regarding Katrina Sharp, at the first trial she testified that Sharp picked up two of her children at daycare that day. She answered questions about the sign-in/out sheets at the daycare. On cross-examination, she stated she learned the police were looking for her brother the day after the shooting but did not inform him of that when she spoke with him two days later. She did not testify at the second trial or the evidentiary hearing.

¶ 73      As for Anderson, Sharp argues that his affidavit and testimony at the evidentiary hearing defeat *res judicata* because the last-minute decision not to call him as an alibi witness constituted new information not available when Sharp filed his direct appeal. Sharp maintains that the first jury's inability to reach a verdict "demonstrates the prejudice counsel's deficient performance caused, as the substantive alibi witnesses' testimony cast the whole of the evidence in a different light."

¶ 74      Notwithstanding, this issue of ineffectiveness of trial counsel was raised on direct appeal and resolved, "Counsel's decision to only call the daycare employee [Woods] as an alibi witness was not the result of inadequate preparation, but trial strategy. The other two witnesses [Katrina Sharp and Anderson] did not do well during cross-examination in defendant's first trial. * * * Defense counsel's actions were reasonable and, therefore, cannot support defendant's claim of ineffective assistance." *Sharp*, 2015 IL App (1st) 130438, ¶ 107.

¶ 75      Issues already decided on direct appeal are barred by *res judicata*. 725 ILCS 5/122-3 (West 2018); *People v. Tenner*, 206 Ill. 2d 381, 392 (2002). See also *People v. Guerrero*, 2012 IL 112020, ¶¶ 16-17 (noting these principles also defeat "cause" prong). Decisions regarding which witnesses to call and what evidence to present "ultimately rest with trial counsel and have long been viewed as matters of trial strategy that are generally immune from ineffective assistance claims." *People v. Coleman*, 2023 IL App (1st) 210263, ¶ 27 (quoting *People v. West*, 187 Ill. 2d 418, 432 (1999)). In sum, the new information neither makes the substantive content of Anderson's proposed testimony any more or less credible nor adds to Sharp's alibi.

¶ 76      Under the first prong in *Strickland*, "effective assistance of counsel refers to competent, not perfect, representation" (*People v. Palmer*, 162 Ill. 2d 465, 476 (1994)) and therefore "mistakes in strategy or in judgment do not, of themselves, render the representation incompetent" (*People v.*

*Fuller*, 205 Ill. 2d 308, 331 (2002)). Sharp must overcome "the strong presumption that counsel's performance fell within [the] wide range of reasonable professional assistance," and he has not done so. *People v. Williams*, 2020 IL App (1st) 162512, ¶ 84 (quoting *Palmer*, 162 Ill. 2d at 476).

¶ 77                                                      Appellate Counsel

¶ 78        Appellate counsel need not "brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Sharp contends, however, that appellate counsel should have raised prosecutorial misconduct at sentencing in response to the State's presentation of Sharp's affiliation with gang activity.

¶ 79        The record contradicts Sharp's assertions. Appellate counsel argued gang affiliation on direct appeal, and we addressed it. Appellate counsel contended that the trial court erred by questioning jurors about gangs and admitting evidence such as Sharp's nickname and wanted poster. *Sharp,* 2015 IL App (1st) 130438, ¶ 99. Appellate counsel also raised posttrial counsel's ineffectiveness at sentencing. *Id.*, ¶ 116. We rejected that claim because the court had mitigating information from the presentence investigation, where Sharp admitted to gang membership, although he claimed to have quit. *Id.*, ¶ 61. The State countered with evidence indicating that he later described himself as a ranking member. See *People v. Spears*, 256 Ill. App. 3d 374, 382 (1993) ("gang affiliation is but one of the factors a judge may consider when sentencing"); see also 730 ILCS 5/5-5-3.2(a)(15) (court may weigh in aggravation that "defendant committed an offense related to the activities of an organized gang"); *People v. Ryan*, 336 Ill. App. 3d 268, 274 (2003) ([T]rial court is not limited to considering statutory aggravating factors but may consider any factor consistent with the statute that would tend to aggravate the offense.").

¶ 80        If anything, the prosecutors ensured that the jury would not hear unnecessary information about Sharp's gang involvement and properly admitted it at sentencing, where it was relevant. Given this record, Sharp's underlying complaint does not equate to ineffective assistance of appellate counsel, as it would have been imprudent for counsel to argue prosecutorial misconduct.

¶ 81        Finally, we address Sharp's assertion that the court did not rule on the issue of ineffective appellate counsel because the written ruling lacks mention of it. Even so, in its oral ruling, the court stated: "At the third stage post-conviction hearing, the burden is on the defendant to prove the allegations by a preponderance of the evidence. I do find that here the defendant has failed to meet the burden in all the allegations presented and has failed to make a substantial showing of a constitutional violation, so defense request for post-conviction relief is hereby denied."

¶ 82        In a criminal proceeding, the pronouncement of the sentence constitutes the judicial act that comprises the court's judgment, and the written document is a ministerial act that serves as evidence of that judgment. *People v. Smith*, 242 Ill. App. 3d 399, 402 (1993). When the court's oral pronouncement and the written order conflict, the oral pronouncement controls. *People v. Jones*, 376 Ill. App. 3d 372, 395 (2007). The principle applies here, where the judge explicitly stated that Sharp failed to both meet his burden and make a substantial showing of a constitutional violation.

¶ 83                                    *Due Process*

¶ 84        Finally, Sharp contends that his constitutional right to due process was violated due to Detective Banks having engaged in a pattern and practice of coercing witnesses, citing *People v. Anderson*, 2024 IL App (1st) 200462-B, where this court found "ample pattern and practice evidence offered regarding the detectives who allegedly coerced defendant's statement." *Id.* ¶ 216. Sharp supports his claim through a civil complaint in an unrelated federal case, the affidavit from

Brown, and testimony from a long-time close friend, Rodney Bowles. Nothing in the record, however, raises an inference of bias or motive for Banks to provide false testimony in this case.

¶ 85        Sharp introduced as evidence a federal civil rights complaint, *Ezra Hill v. City of Harvey, et al.*, Case No. l:17-cv-04699. Among its allegations are that Detective Banks and other law enforcement officers coerced Hill to confess in a 1992 sexual assault and homicide case. "Over a decade later, the results of DNA testing resulted in the trial court vacating both convictions and the State dropping the charges." *Hill v. City of Chicago*, 86 Fed. R. Evid. 556 (N.D. Ill. Sept. 1, 2011).

¶ 86        Sharp argues that the similar time frame and geographical area in the *Hill* case bolsters his due process claim. In *Hill*, the jury returned a verdict against Banks on malicious prosecution and in favor of Banks on unlawful pretrial detention. *Hill v. City of Harvey*, 732 F. Supp. 3d 862, 867 (ND. Ill. May 2, 2024) ("the Court finds that the jury's determination that Thomas and Banks lacked probable cause to believe that Hill had committed a crime was supported by legally sufficient evidence."). While Banks lost on the malicious prosecution claim, nothing in *Hill* speaks to, let alone is probative of, the issue of coercion here.

¶ 87        Brown's handwritten affidavit, dated December 12, 2015, stated that on the day of the shooting, he was arrested and told that he would be charged with the shooting unless he identified "Keyshon Sharp, aka "Baby Stone" as "the person who ran to my car with a gun." Brown stated he knew that was a lie, but he had "pending legal matters" and a newborn child to care for.

¶ 88        In a written order, the trial court explained its reasoning after carefully evaluating the evidence. It found Brown's affidavit to be "weak on details" when compared to his consistent trial and grand jury testimony as well as his written statement. As telling, the testimony from the victim and his father remained unchallenged and uncontradicted.

¶ 89     Bowles was Sharp's final witness at the hearing. He testified that years before, after being beaten up, Banks and other law enforcement officers visited him in the hospital. When Banks asked Bowles who had assaulted him, Bowles stated that he was "out of it" due to pain medication. After his release from the hospital, law enforcement approached Bowles and told him that if he did not identify Sharp as the perpetrator, Banks "was going to put a case on me." Bowles responded to Banks that he would not lie. On cross-examination, Bowles verified no one was ever charged in connection with the beating.

¶ 90     The court did not find Bowles's testimony credible. It explained that his testimony was self-contradictory: although Bowles claimed a clear memory of being told to lie, he displayed a "very faulty memory" and often appeared confused while testifying.

¶ 91     Sharp has not shown that the trial court's findings were manifestly erroneous. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22 (error is manifest when clearly evident, obvious, and indisputable).

¶ 92     Affirmed.